# DIAMOND MATCH COMPANY *v.* ONTONAGON.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE
WESTERN DISTRICT OF MICHIGAN.

No. 96.　Argued December 1, 1902.—Decided January 19, 1903.

1. The village of Ontonagon, Michigan, has power, either under its charter or under the statute of 1899 of Michigan, to assess logs in the boom or sorting boom in the Ontonagon River belonging to plaintiff in error.
2. The legislature of Michigan could confer by statute upon the village of Ontonagon the power to tax logs in transit to Ontonagon as provided in the act of 1899 for taxing personal property; and property which was in transit through the Ontonagon River, and then by the Chicago, Milwaukee & St. Paul Railway was properly assessed at Ontonagon, that being the place in the State nearest to the last boom or sorting gap of the stream in or bordering on the State in which said property naturally would be and was intended to be last floated during the transit thereof.
3. There may be an interior movement of property within the State which does not constitute interstate commerce though the property come from or be destined to another State; and where one hundred and eighty million feet of logs are cut, hauled and put into the Ontonagon River during two seasons for the purpose of saving, protecting and preserving the same, and the owner cannot use more than twenty to forty million in any year, and it was not the intention to take all the logs down at the opening of the streams but only to take down each season the number that could be used, the logs in the sorting gap cannot be regarded as property engaged in interstate commerce so as to be exempted from taxation under the laws of Michigan. *Coe v. Errol*, 116 U. S. 617, followed.

This is a bill in equity to restrain the collection of certain taxes levied under the following law of the State of Michigan :

" Personal property of non-residents of the State, and all forest products owned by residents or non-residents, or estates of deceased persons, shall be assessed in the township or ward where the same may be, to the person having control of the premises, store, mill, dock, yard, piling ground, place of storage, or warehouse where such property is situated in such township, on the second Monday of April of the year when the assessment is made, except that where such property is in transit to some place within

the State it shall be assessed in such place, except that where such property is in transit to some place without the State it shall be assessed at the place in this State nearest to the last boom or sorting gap of the stream in or bordering on this State in which said property will naturally be last floated during the transit thereof, and in case the transit of any such property is to be other than through any watercourse in or bordering on this State, then such assessment shall be made at the point where such property will naturally leave the State in the ordinary course of its transit; and such property so in transit to any place without the State shall be assessed to the owner or the person, persons or corporation in possession or control thereof, and in case such transit will pass said logs through the booms or sorting gaps, or into the places of storage of any person, persons or corporation operating upon any such stream, then such property may be assessed to such person, persons or corporation; and the person, persons or corporation so assessed for any such property belonging to a non-resident of this State shall be entitled to recover from the owner of such property, by a suit in attachment, garnishment or for money had and received, any amount which the person, persons or corporation so assessed is compelled to pay because of such assessment, and shall have a lien upon said property as security against loss or damage because of being so assessed for the property of another and may retain possession of such property until such lien is satisfied: *Provided, further,* That any owner or person interested in said property may secure the release of the same from such lien by giving to the person, persons or corporation so assessed a bond in an amount double the probable tax to be assessed thereon, but not less than the sum of two hundred dollars, with two sufficient sureties, conditioned for the payment of such tax by said owner or person interested, and the saving of the person, persons or corporation assessed from payment thereof, and from costs, damages and expense on account of his non-payment, which bond as to amount and sufficiency of surety shall be approved by the county clerk of the county in which the assessment is made." Pub. Laws, 1899, No. 32, p. 47.

It was contended that the taxes assessed were illegal and

void, " because said taxes were assessed in violation of and re-
pugnant to the general provisions of the Constitution of the
United States; and especially because said taxes were assessed
in violation of, and said statutes of the State of Michigan are
in violation of and repugnant to, those parts of section 8 of
article I of the Constitution of the United States, which pro-
vide that: ' The Congress shall have power .. . . to regu-
late commerce with foreign nations, and among the several
States,' and section 10 of said article, which provides that:
' No State shall, without the consent of the Congress, lay any
imposts or duties on imports or exports, except what may be
absolutely necessary for executing its inspection laws.' "

By stipulation the bill was dismissed as to the township of
Ontonagon and the township of McMillan. As to the other
defendants the bill was submitted on an agreed statement of
facts and the pleadings. The court sustained the assessment
and dismissed the bill. This appeal was then taken under
section 5 of the judiciary act of 1891.

The following is the stipulation of facts:

" It is hereby further stipulated by and between the com-
plainant and the defendants Village of Ontonagon, and George
Ducleau, its treasurer, that the following statements of fact
are true, and may be used in evidence on the hearing of said
cause by either of the parties to this stipulation, subject to ob-
jections for immateriality, to wit:

" 1. The complainant is a corporation organized and existing
under and by virtue of the laws of the State of Illinois, with
its principal office and place of business in the city of Chicago,
in said State; that it is engaged, and has been from the date
of its organization, in the manufacture and sale of matches,
and that in the prosecution of its business it purchased and be-
came the owner of a large amount of pine wood, timber, etc.,
situate on the Ontonagon River and its tributaries in Onto-
nagon County and other counties in the State of Michigan, and
that for many years prior to 1896 it owned and operated ex-
tensive saw mills and plant near the mouth of the Ontonagon
River, and within the corporate limits of the defendant Village
of Ontonagon ; that, in its usual course of business, it cut or

purchased a sufficient quantity of timber to supply its mills during the following season, not exceeding forty million of feet, board measure, and placed the same during the winter upon and in said Ontonagon River and its tributaries, there to remain until the breaking up of the ice in said river in spring time, when they were and are driven down the river to the pier jams, booms and sorting grounds of the complainant, located above said mills, and outside of the limits of defendant, The Village of Ontonagon.

" 2. That in the summer of the year 1894 extensive forest fires swept over said pine lands of the complainant, and other pine lands, situate on said Ontonagon River, doing great damage to the timber thereon ; that in order to preserve the timber so injured by said fire, it became and was necessary to cut all of said timber and put the same into the waters of the above-named stream for preservation ; that during the winter of 1894 and 1895 said complainant, in order to preserve said timber, was compelled to cut and did cut about one hundred and eighty million feet of logs, and for the sole purpose of preservation placed the same in said river and its tributaries, there to remain until the complainant could float said logs down said river and streams to its mills to be manufactured into lumber; that it was not the intention or purpose of the complainant after the opening of navigation and during the season of 1896 to remove all said logs, but only such amount as could be manufactured at its said mills during the season, and that the capacity of said mills did not exceed about the amount of forty million feet per annum, as hereinbefore stipulated.

" 3. That the navigation of said river and stream is closed by reason of the formation of ice about the first of December of each year, and is not open until after the first of May, following in each year.

" 4. That in the month of August, A. D. 1896, the complainant's said mills were destroyed by fire, and that thereafter it became necessary, and the complainant did transport said logs by the Chicago, Milwaukee & St. Paul Railway, from Ontonagon to its saw mills located at Green Bay, in the State of Wisconsin. That in the regular prosecution of its business of

manufacturing said logs into lumber said complainant has not during any season since 1896 transported a larger quantity of said logs than it could manufacture into lumber at its mills at Green Bay, said quantity being on an average of less than forty million feet of logs, board measure.

" 5. That for the purpose of preserving said logs and preventing the same from floating down said river and into Lake Superior said complainant was compelled to and has utilized certain jam piers, booms and appurtenances, constructed by the plaintiff across said river, more than one mile above the mouth thereof, and beyond the limits of said village of Ontonagon ; that by reason of said appliances said logs have been held in said river and upon the banks thereof above said jam piers, booms, etc., said complainant only passing through said piers such quantities as it could transport and manufacture into lumber at its said mills from time to time during each successive season since the year 1896 ; that during each successive season it has been the usual and necessary practice of the complainant to pass through said piers, booms, etc., such quantities of logs as said railway company could furnish facilities for transportation, thence down the river to the place of delivery as described in paragraph 2 of another stipulation of facts made herein to said railway company, to be loaded upon cars for transportation, and that said place of delivery was near the mouth of said river and within the corporate limits of said defendant The Village of Ontonagon ; that all of said logs so delivered to said railway company are transported over its lines to Green Bay, Wisconsin, leaving the State of Michigan at a point near the village of Iron Mountain in said State.

" 6. That at the close of the season of 1898 the logs in controversy were held by said complainant and detained and preserved by said jam piers, booms, etc., in said Ontonagon River, above and beyond the limits of said defendant, The Village of Ontonagon, waiting the delivery for transportation, as aforesaid, during the following season of the year 1899, and that all of said logs were a part of the entire quantity cut and put in said river during the winter of 1895 and 1896, and had since that date been so held and detained by the complainant in its

regular course of business; that all of said logs were so held and detained, and by reason of the ice in said river could not be floated down the same until about the middle of May, 1899, and that said logs so assessed, as charged in said bill of complaint, were not at the time said assessment was made, and on the second Monday of April, A. D. 1899, were not, except as stated in paragraph 4 of another stipulation, made herein, and never had been within the corporate limits of the said defendant, The Village of Ontonagon.

"7. That the logs in controversy at the time said assessment was made by said defendant, The Village of Ontonagon, were and had been for more than one year prior thereto, in the manner above described, held and detained by the complainant within the municipal limits of the township of McMillan in said county of Ontonagon, and were assessed for the purpose of levying a tax thereon, for the year 1899, by the proper officers of said township of McMillan, claiming the right so to do under the general statutes and laws of the State of Michigan.

" It is further stipulated and admitted by the parties to this stipulation that the assessment of the complainant's logs in controversy was not valid unless it shall be held as a question of law that the defendant, The Village of Ontonagon, had the legal right to assess said logs in said river outside and beyond the geographical limits of said village, as being in transit under the statutes of the State of Michigan in such case made and provided."

The other stipulation of facts referred to is as follows:

" 1. Complainant shipped by rail from the village of Ontonagon to its mills at Green Bay, Wisconsin, for sawing there, the following quantities of logs, at the following times out of its logs in the Ontonagon River, described in the bill of complaint:

" Forty-two million feet in the season of 1897; thirty-seven million feet in the season of 1898, and fourteen million feet in the season of 1899 up to the date of the seizure of logs by the village of Ontonagon for the satisfaction of the tax levied and assessed in and by said village in the year last named.

" 2. Within the village of Ontonagon, is, and has been, situ-

ated in and throughout the year 1899 the last boom or sorting gap in said river, from which complainant's logs in said river are taken and placed upon the railroad cars for shipment to its said mills at Green Bay, and said boom or sorting gap is the last place in said river where said logs are floated before shipment by rail as aforesaid.

"3. During the season of 1899, beginning about June 1, and up to the time of the seizure above mentioned, about — million feet of the ten (10) million feet of logs mentioned in the bill of complaint, were driven down the said river from the boom, pier jam or sorting grounds outside of said village, to the boom or sorting gap within said village, above described, and shipped thence by rail to complainant's said mills at Green Bay.

"4. About five hundred thousand feet of complainant's said logs in said river have been )in said river of slough) constantly within said village since 1898, for the purpose of shipment by rail to the destination as aforesaid.

"5. The village of Ontonagon is a duly incorporated village under the general law of Michigan, to wit: act number 3 of the Laws of Michigan of the year 1895, entitled 'An act to provide for the incorporation of villages within the State of Michigan, and defining their powers and duties,' and is situate on said river and in The Township of Ontonagon, one of the defendants herein.

"6. The water transit of said logs of complainant has heretofore always ceased since the burning of complainant's mills, described in the bill of complaint, in said village, whence the same are shipped by rail as aforesaid.

"7. Said river and its tributaries are streams of water or rivers, all within the State of Michigan and within the county of Ontonagon (and as to some small part within the counties of Gogebic and Houghton) in which county of Ontonagon said village is situated.

"8. Pursuant to and in accordance with the acts of the legislature of Michigan mentioned in the answer of said village in this suit, namely, act number 319 of the Laws of 1893, and act number 263 of the year 1895, and pursuant to and in accordance with a vote of the electors of the said village, duly held

therein, and pursuant to, and in accordance with the action of its council, said village, in the year 1894, borrowed the sum of thirty thousand dollars ($30,000), and issued and sold its bonds therefor, and in the year 1895 borrowed the further sum of twelve thousand dollars ($12,000), and issued its bonds therefor, and all of said bonds, being in principal and interest about forty thousand dollars ($40,000), were, at the date of filing the bill of complaint in this cause, outstanding, and said bonds outstanding constitute a valid charge against said village and against the taxable property thereof."

*Mr. Edwin Walker* for the appellants argued:

I. The village of Ontonagon had no power to assess property for taxation and levy taxes thereon, except as specially conferred by the general or special statutes of the State of Michigan. Compiled Laws of Michigan, vol. 1, p. 913, §§ 1, 2, 6; Cooley on Taxation, pp. 96, 209, 474; Dillon's Municipal Corporations, 4th ed. § 763; *In re Second Ave. M. E. Church,* 66 N. Y. 395; *English* v. *People of the State of Illinois,* 96 Illinois, 566.

II. The State of Michigan could not by legislative grant authorize the village of Ontonagon to impose a tax upon the property of non-residents when the situs of such property was beyond its municipal limits and jurisdiction. *Wells* v. *Weston,* 22 Missouri, 384; *In re Assessment of Lands &c.,* 66 N. Y. 398; *Trigg* v. *Glasgow,* 2 Bush, 594; *City of St. Louis* v. *Ferry Co.,* 11 Wall. 430.

III. The statute of the State of Michigan, under and by authority of which the complainant's property was assessed for taxation, is in contravention of, and repugnant to, the Constitution of the United States. *Coe* v. *Errol,* 116 U. S. 517; *The Daniel Ball,* 10 Wall. 557–565; *State Freight Tax Case,* 15 Wall. 272.

IV. Under the admitted facts equity has jurisdiction to enjoin the collection of the tax. Cooley on Taxation, 2d ed. 784; *Pacific Hotel Co.* v. *Lieb,* 83 Illinois, 602; *Railway Co.* v. *Cole,* 75 Illinois, 591; *Cook County* v. *Railroad Co.,* 35 Illinois, 460; *Bank of Kentucky* v. *Stone,* 88 Fed. Rep. 383; *Ogden City* v.

*Armstrong*, 168 U. S. 224; High on Injunctions, §§ 502, 530; *Smyth* v. *Ames*, 169 U. S. 515; *Hazard* v. *O'Bannon*, 36 Fed. Rep. 855; *Parmalee* v. *Railroad Companies*, 3 Dillon, 25.

*Mr. T. L. Chadbourne* submitted a brief on behalf of appellees.

MR. JUSTICE MCKENNA, after making the foregoing statement, delivered the opinion of the court.

The contention of appellant is presented in three propositions. (1) That the village of Ontonagon had no power to assess the property under its charter. (2) That the legislature could not confer such power. (3) That the property was in the course of transportation within the meaning of the commerce clause of the Constitution of the United States.

1. This proposition is unimportant. If the charter did not, the statute of 1899 did, authorize the assessment.

2. To sustain this proposition would embarrass the power of the State—indeed, make it impotent to deal with the conditions there existing. The statute, no doubt, was enacted as a means to subject property to taxation which had no definite or enduring locality, and because of the clash or confusion of jurisdictions. In such circumstances experience, probably, demonstrated that property escaped taxation or was difficult to tax, or that controversies arose. It was competent for the legislature to defeat either result by giving moving property a definite situs as of some day. Nor is that power impugned by the principle that protection is the consideration of taxation. There is protection during the transit through the municipalities of the State and at its termination in the State—protection accommodated to the kind of property and as efficient as links are to the continuity of a chain.

There is nothing in the cases cited by appellant which sustains the opposite view. *Trigg* v. *Glasgow*, 2 Bush, 594, seems to have turned upon the interpretation of a state statute. Under a statute of the State the town of Glasgow was authorized to subscribe to the stock of a railroad, and by the charter of

the town it was the duty of the trustees to " levy an *ad valorem* tax on the property, both real and personal, within said town, that is listed for state purposes, including the amount given in under the equalization law, sufficient," etc.

By an amendatory act it was provided that " all the taxable property in said town on the 10th of April shall be subject to taxation for the payment of said subscription ; " and it also provided that the taxable property *in* said town which may have been removed without its limits between the 1st of January and the 10th of April, for the purpose of evading the tax, should be listed for taxation.

The court held, as we understand its opinion, that property to be subject to taxation under the statute must be *in* the town. If it had been taken out to avoid taxation, it was subject to taxation when brought back.

*St. Louis* v. *The Ferry Co.*, 11 Wall. 423, was also an interpretation of the state statute. The city of St. Louis had power to tax all property *within the city.* It was held under the circumstances of the case that the ferry boats of the ferry company had their situs in the State of Illinois. It was said :

" Their relation to the city was merely that of contact there, as one of the termini of their transit across the river in the prosecution of their business. The time of such contact was limited by the city ordinance. Ten minutes was the maximum of the stay they were permitted to make at any one time. The owner was, in the eye of the law, a citizen of that State, and from the inherent law of its nature could not emigrate or become a citizen elsewhere. As the boats were laid up on the Illinois shore when not in use, and the pilots and engineers who ran them lived there, that locality, under the circumstances, must be taken to be their home port. They did not so abide within the city as to become incorporated with and form a part of its personal property."

In *Wells* v. *Weston*, 22 Missouri, 384, and *In Assessment of Lands in the Town of Flatbush, &c.*, 60 N. Y. 398, the property taxed was real estate.

The purpose of the statute of Michigan is to assess the forest products of the State—things which are a part of the general

property of the State. Those " in transit " are assessable according to their destination. If that be " some place within the State," the property is to be " assessed in such place; " if that be " some place without the State," the property is to be assessed at the place in the State " nearest to the last boom or sorting gap of the same in or bordering on this State in which said property will naturally be the last floated during the transit thereof."

But it is also provided that " *in case the transit of any such property is to be other than through any watercourse in or bordering on this State, then such assessment shall be made at the point where such property will naturally leave the State in the ordinary course of its transit.*"

We may assume for the present that the property was in transit and to some place without the State. Was the " transit to be other than through any watercourse in or bordering on " the State ? The appellant contends that it was because it was to be by water and by rail; in other words, the transit was not to be exclusively " through any watercourse." But to give that meaning to the statute words must be added to it. It must be made to read other than *exclusively* or *wholly* or *entirely* " through any watercourse." One of these words must be added to make the sense contended for. The word " other" is used to express a difference—the difference being between a transit which is and one which is not through *any* (the word is significant) watercourse.

The transit in controversy was to be through (by means of) the Ontonagon River, certainly a watercourse, and by the Chicago, Milwaukee and St. Paul Railway, and, therefore, the property was properly assessed by the village of Ontonagon, that being the place in the State nearest to the last boom or sorting gap of the stream in or bordering on the State in which said property naturally would be and was intended to be last floated during the transit thereof.

3. Was the transit interstate commerce? We agree with counsel that it is unimportant in determining an answer whether the transit " was by water or by railroad, or both water and railroad." But no purpose to burden interstate commerce is

evident in the statute, and the power of the State to tax every-thing which is part of what has been called " the general prop-erty " or " the general mass of property " of the State, is un-doubted. But things which have been brought to a State may not have reached that condition. Things intended to be sent out of a State, but which have not left it, may not have ceased to be in that condition. The exact moment in either case may not be easy to point out—may be confused by circumstances, and the confident assignment of the property as subject or not subject to taxation is not easily made. Fortunately we are not without illustrations in prior cases, and in *Kelley* v. *Rhoads*, p. 1, *ante*, decided concurrently with this, we express the prin-ciples of decision.

In *Brown* v. *Houston*, 114 U. S. 622, the property (coal in barges) had reached the State, but was yet in the boats in which it had been brought into the State. While on the barges it was offered for sale. It was held it had become part of the property of the State and was subject to taxation. *Pittsburg &c. Coal Co.* v. *Bates*, 156 U. S. 577, had facts assimilating it to the case at bar, and it was affirmed on the authority of *Brown* v. *Houston*. As in the latter case, the tax was on coal in barges shipped from the mines in Pennsylvania, and con-signed to New Orleans, Louisiana. The coal, however, had not reached, as the coal in *Brown* v. *Houston*, its exact desti-nation. To accommodate the exigencies of the owner's busi-ness, the barges, " about one hundred in number, were stopped and moored in the Mississippi River at a convenient mooring place about nine miles above the port of Baton Rouge." The coal was held subject to taxation.

In *Coe* v. *Errol*, 116 U. S. 517, logs which had been cut in the State of Maine, and others which had been cut in the State of New Hampshire, were floated in course of transit down a stream in New Hampshire to the town of Errol, in the latter State; thence to be floated down the Androscoggin River to the State of Maine. The town of Errol assessed upon the property a county, town, school and highway tax. The tax was sustained by the Supreme Court of the State of New Hampshire as to the logs cut in that State, and abated as to

those cut in Maine. The judgment was affirmed by this court.

Mr. Justice Bradley, delivering the opinion of the court, expressed the contentions of the parties in two questions :

" Are the products of a State, though intended for exportation to another State, and partially prepared for that purpose by being deposited at a place or port of shipment within the State, liable to be taxed like other property within the State ?

" Do the owner's state of mind in relation to the goods, that is, his intent to export them, and his partial preparation to do so, exempt them from taxation ? This is the precise question for solution."

It is obvious that like questions could be framed upon the facts of the case at bar to express the propositions presented. Mr. Justice Bradley's observations, therefore, become pertinent and decisive. He discussed every consideration. He clearly exhibited the extent of the power of the State over the property within it, whether in motion or at rest, though destined for points out of it. He said :

" There must be a point of time when they (goods destined to other States) cease to be governed exclusively by the domestic law and begin to be governed and protected by the national law of commercial regulation, and that moment seems to us to be a legitimate one for this purpose, in which they commence their final movement for transportation from the State of their origin to that of their destination. When the products of the farm or the forest are collected and brought in from the surrounding country to a town or station serving as a entrepôt for that particular region, whether on a river or a line of railroad, such products are not yet exports, nor are they in process of exportation, nor is exportation begun until they are committed to the common carrier for transportation out of the State to the State of their destination, or have started on their ultimate passage to that State. Until then it is reasonable to regard them as not only within the State of their origin, but as a part of the general mass of property of that State, subject to its jurisdiction, and liable to taxation there if not taxed by reason of their being intended for exportation, but taxed with-

out any discrimination in the usual way and manner in which such property is taxed in the State."

And further:

" But no definite rule has been adopted with regard to the point of time at which the taxing power of the State ceases as to goods exported to a foreign country or to another State. What we have already said, however, in relation to the products of a State intended for exportation to another State will indicate the view which seems to us the sound one on that subject, namely, that such goods do not cease to be part of the general mass of property in the State, subject, as such, to its jurisdiction, and to taxation in the usual way, until they have been shipped or entered with a common carrier for transportation to another State, or have been started upon such transportation in a continuous route or journey. We think that this must be the true rule on the subject. It seems to us untenable to hold that a crop or herd is exempt from taxation merely because it is, by its owner, intended for exportation. If such were the rule in many States there would be nothing but the lands and real estate to bear the taxes. Some of the Western States produce very little except wheat and corn, most of which is intended for export; and so of cotton in the Southern States. Certainly, as long as these products are on the lands which produce them, they are part of the general property of the State. And so we think they continue to be until they have entered upon their final journey for leaving the State and going into another State. It is true, it was said in the case of *The Daniel Ball*, 10 Wall. 557, 565 : ' Whenever a commodity has begun to move as an article of trade from one State to another, commerce in that commodity between the States has commenced.' But this movement does not begin until the articles have been shipped or started for transportation from the one State to the other. The carrying of them in carts or other vehicles, or even floating them, to the depot where the journey is to commence, is no part of that journey."

These cases are referred to in *Kelley* v. *Rhoads*, 188 U. S. 1, as defining the taxing power of a State. And their substance is declared to be " that while property is at rest for an indef-

inite time or awaiting transportation, or awaiting sale at its place of destination, or at an intermediate point, it is subject to taxation. But if it be actually in transit to another State, it becomes the subject of interstate commerce, and is exempt from local assessment."

In further specialization of these propositions we may say that the cases establish that there may be an interior movement of property which does not constitute interstate commerce, though property come from or be destined to another State. In the one case, though it have not reached its place of disembarkation or delivery, it may be taxed. *Brown* v. *Houston*, 114 U. S. 662. In the other case, until it be shipped or started on its final journey, it may be taxed. *Coe* v. *Errol*, 116 U. S. 617.

The case at bar falls within this principle. It is alleged in the bill that during the winters of 1895 and 1896 the plaintiff cut, hauled and put into the Ontonagon River and its tributaries, one hundred and eighty million feet of logs for the purpose of saving, protecting and preserving the same; that said lumber was more than plaintiff could utilize in any one season at its mills, and it was not, therefore, the intention at the opening of the streams to make a clean drive of the same, but only to take down the streams the following spring and summer, and each succeeding driving season, the number complainant could utilize; that complainant was at the time the logs were cut and put in the streams an owner of lumber mills situated at or near the corporate limits of the village of Ontonagon; that said mills were destroyed by fire in the fall of 1896, and were not rebuilt, and that after the destruction thereof plaintiff destined the logs for its mills at Green Bay, Wisconsin, but that it was not its intention to take to said mills during any one summer any more than sufficient for its purposes, and not to exceed generally twenty million feet—according to the stipulation forty million feet. The route of the logs from the forests to the mills is described as follows:

" They are driven down the tributaries of said Ontonagon River into the stream of said river and thence down said Ontonagon River to a point at or near the mouth thereof, in the

township of Ontonagon, to the sorting grounds and pier jams of the complainant; they are then loaded aboard cars and shipped by rail to Green Bay, Wisconsin, via the Chicago, Milwaukee & St. Paul Railway, and pass out of the State of Michigan at a point near the village of Iron Mountain in said State."

The number of the logs shipped by rail from Ontonagon to Green Bay before the levy of the tax complained of is given in the stipulation of facts, and it is stipulated that "about five hundred thousand feet of complainant's said logs in said river have been (in said river of slough) constantly within said village since 1898, for the purpose of shipment by rail to the destination as aforesaid."

The appellant's contention is that the movement of the logs commenced at the opening of navigation of the river (presumably in the spring or summer of 1896 and 1897,) and from that date were in continuous transit as subjects of interstate commerce, and exempt from taxation. The contention is more extreme than that made and rejected in *Coe* v. *Errol.*

*Decree affirmed.*