## GULF REFINING CO. OF LOUISIANA v. PHILLIPS, Tax Collector.

## SAME v. SANDLIN, Tax Assessor.

(District Court, W. D. Louisiana, Shreveport Division. February 20, 1925. On Rehearing May 12, 1925.)

Nos. 196, 199.

1. **Commerce** ⊜➡72—**Oil stored awaiting transportation held subject to local taxation.**

Oil in tanks, located on pipe lines extending from fields of production to refineries in another state, some of which had remained in storage for several months in the tanks, which were of greater capacity than required for continuous operation of the pipe lines and at all times contained a large quantity of oil, *held* not in course of interstate transportation, but to have a local situs, and to be subject to local taxation.

2. **Courts** ⊜➡263—**Jurisdiction of federal court, once attached, extends to all questions involved.**

Where a suit involves the right of a state to tax property claimed to be in course of interstate transportation, a federal court, having acquired jurisdiction because of the constitutional question, has jurisdiction to determine all other matters involved therein.

3. **Schools and school districts** ⊜➡97(1)—**When issuance of bonds cannot be controlled by courts, stated.**

Where the taxable property within a school district justifies the issuance of bonds under the state statute, the discretion of its officers as to the amount of bonds issued, the length of time they are to run, etc., cannot be controlled by the courts.

. In Equity. Suit by the Gulf Refining Company of Louisiana against A. H. Phillips, Tax Collector, and against M. H. Sandlin, Tax Assessor. On motion of respondent in the first case for leave to introduce further evidence. Granted. Decree for respondent in second case.

J. S. Atkinson and F. E. Greer, both of Shreveport, La. (D. Edward Greer, of Houston, Tex., of counsel), for complainant.

Harry P. Sneed, of New Orleans, La., R. H. Lee and D. W. Stewart, both of Minden, La., and Robert A. Hunter, of Shreveport, La., for respondents.

DAWKINS, District Judge. These two suits have been submitted together for the reason that they involve the validity of state and local taxes sought to be collected in the one case and to be assessed in the other, against complainant's property in the parish of Webster. In other words, in the first case an injunction is asked to prevent collection of said taxes, and in the second to restrain a similar assessment for the succeeding year.

The property involved is the estimated average amount of crude oil contained in some 17 tanks situated near Dubberly, in said parish, during the years respectively for which the taxes are claimed. The principal contention of complainant (other than certain matters of procedure which I shall consider further on) is that the said taxes are "illegal, unconstitutional, null and void for the reason said oil on which said taxes were purported to be levied was never at any time at rest in Webster parish, as its destination, but on the contrary all of such oil at all times while within said parish was in actual transit through the parish in interstate commerce and was enroute from the state of Arkansas and from Claiborne parish, state of Louisiana, to the state of Texas, and, therefore, said purported levies and the said taxes claimed by reason thereof * * * are in violation of sections 8 and 10 of article 1 of the Constitution of the United States. * * * *"

It is further contended that the special tax levied by the Dubberly school district is void for the reason that its attempted imposition is an unconscionable abuse of the taxing power, in fact a taking of complainant's property without due process of law and a denial to it of the equal protection of the law, in this, to wit: That after its said tanks were erected at Dubberly, a local school district known as Dubberly district No. 27 was designedly and fraudulently created so as to include its said property, and a bond issue of $50,000 authorized with the view and intention that approximately 80 per cent. of the taxes necessary to redeem the same with interest should be paid by complainant, since the attempted assessment against it represents that proportion of the entire taxable property within said district; that this illegal purpose is further disclosed by the fact that, instead of providing that said bonds should mature over a long period of years, not to exceed 40 under the Constitution, as is usually done, the time was deliberately fixed at the extraordinarily short period of 5 years in order that the same might be paid before the oil fields from which complainant was obtaining its said oil could be exhausted; and that while it is thus called upon to pay such a large proportion of said taxes, "it receives no benefit, or far less benefit, from the school building than any other taxpayers in the district." These contentions, which are common to both cases as well as to one previously heard by Judge Foster, formerly of the Eastern district of Louisiana, sitting in the place of the late Judge Jack, but now on the appellate bench of this circuit, are, of course, all controverted by the respondents.

The first and paramount question to be decided is one of mixed fact and law, and that is: Was the oil, at the time it was sought to be taxed, being transported in interstate commerce? If so, then all other issues necessarily disappear, for it is conceded that neither the state nor its subdivisions have the power to tax under such conditions.

The facts as I appreciate them are substantially as follows: Plaintiff and its associated companies have for many years been engaged in the production, transporting, and refining of crude oil in the states of Louisiana and Texas. The source of production in Louisiana had been for many years, prior to 1919, mainly in the Northwestern and Southwestern portions of the state; but in the early part of the latter year, a very rich oil field was discovered in the parish of Claiborne, where none before had been found. It was located some 50 miles east of the Caddo field. During the latter part of 1919 and early in 1920, complainant constructed a pipe line from Ferguson in Claiborne, to Dubberly in Webster parish, and built at the latter point 17 tanks each of the capacity of approximately 55,000 barrels. The tanks cost between $350,000 and $400,000. In the months of January to April, inclusive, they were nearly all filled with oil, which condition continued throughout practically the re-

mainder of the years 1920, 1921, 1922, and 1923; but during the latter half of 1923 it had been greatly reduced, so that while there was some oil in all 16 of the tanks (1 in the meantime having been destroyed by lightning), at the end of 1923 it varied from a few hundred to a few thousand barrels each. About the latter part of March or first of April, 1920, complainant completed its pipe line from Dubberly to East Point on the south, and this gave it a connection through Mansfield, in De Soto parish, which permitted this oil to be delivered to the Gulf Refining Company of Texas at the state line, as was already being done with oil produced in Red River and De Soto parishes. The capacity of the line leading into Dubberly, under ordinary conditions, was approximately 16,000 barrels, while the one running south from there was about half that size or could carry say 8,000 barrels per day. For pumping purposes from 2 to 4 tanks are ordinarily used.

After the discovery of oil in Union county, Ark., complainant received from that field, through pipes connecting with the one built from Ferguson, oil which was also pumped into the tanks at Dubberly.

On March 25, 1922, complainant, through its tax commissioner, made a return to the assessor of Webster parish of its property for taxation showing an average of 526,170 barrels of oil in its tanks during the year 1921 (the basis of assessment being the average quantity on hand during the preceding year), valuing it at $1.58 per barrel, or a total of $831,340. This return was increased by the assessor to $1,104,967, but upon application to the Louisiana Tax Commission, the assessment was reduced to approximately the figures originally rendered by complainant. No return was made for 1923.

As heretofore indicated, the complainant seeks to prevent collection of the taxes for the years 1922 and 1923 and to enjoin the assessment of 1924. The case covering 1922 is in the hands of Judge Foster, while those for the two subsequent years are the ones now under consideration.

Since the submission of the present cases, respondent in No. 196 has filed a motion to reopen for the purpose of enabling him to prove that a certain resolution offered to the school board by one of its members for levying the school taxes of 1923 was actually adopted. This motion is strongly opposed by the complainant; but before adverting to it again, I shall dispose of the questions of law which are applicable to both cases.

[1] The reason given by complainant for constructing so many tanks at Dubberly, 17, when ordinarily 2 to 4 would have been sufficient to serve a pumping station in transporting its oil, is that it could not get the iron pipe to connect its line from that point south, and it needed the extra tanks to take care of flush production in the newly discovered Claiborne field, as a means of holding it for shipment by rail; also, that at times there might be breaks below that station, and it would need these facilities to receive the oil while repairs were being made. However, as hereinabove stated, it is shown that oil was kept in all of the tanks throughout the entire period from 1920 to 1923, inclusive. In some cases the same oil was so held for several months, and in at least one instance, for approximately a year. In most other cases it varied from a few weeks to several months. In justification of this course, it is said that the policy was to always pump the freshest oil first, and this sometimes required that in the other tanks to be held longer than otherwise would have been done.

The facts as disclosed by the record, the substance of which I have related here, convince me that the tanks at Dubberly were intended to be used and were actually used as something more than means of facilitating the transportation of oil. There was at all times a very large and valuable property interest at rest in the state and parish enjoying the protection of local laws, and as such it owed the duty of support to state and parochial governments, the same as any other property.

[2] Some objection has been made by respondent that this court is without jurisdiction to decide the local issues raised in these suits, but having acquired jurisdiction upon the constitutional question of the power to tax property claimed to be in interstate commerce, I am of the view that I have the right to decide all other matters arising in the cases. Siler v. L. & N. Ry. Co., 213 U. S. 175, 29 S. Ct. 451, 53 L. Ed. 753; Greene v. L. & I. R. Co., 244 U. S. 499, 37 S. Ct. 673, 61 L. Ed. 1280, Ann. Cas. 1917E, 88.

Complainant has cited a number of cases to sustain its contention, among them Champlain Realty Co. v. Town of Brattleboro, 260 U. S. 366, 43 S. Ct. 146, 67 L. Ed. 309, 25 A. L. R. 1195; Stafford v. Wallace et al., 258 U. S. 495, 42 S. Ct. 397, 66 L. Ed. 735, 23 A. L. R. 229; Lemke v. Farmers' Grain Co., 258 U. S. 50, 42 S. Ct. 244, 66 L. Ed. 458; Eureka Pipe Line Company v. Hallanan, 257 U. S. 265, 42 S. Ct. 101, 66 L. Ed. 227; United Fuel & Gas Company v.

Hallanan, 257 U. S. 277, 42 S. Ct. 105, 66 L. Ed. 234; G. H. & S. A. R. R. Co., etc., v. State of Texas, 210 U. S. 217, 28 S. Ct. 638, 52 L. Ed. 1031.

It is well to repeat here that respondent concedes that the state and its subdivisions are without power to tax the oil, if as a matter of fact it was in continuous movement in interstate commerce, but does contend that the facts in these cases show a considerable quantity of it to have been held at rest in the tanks for such length of time and under such circumstances as to render it subject to local taxation.

In Champlain Realty Company v. Brattleboro, supra, the plaintiff had placed in the West river and its tributaries in Vermont about 10,000 cords of wood, to be carried by way of its conjunction with the Connecticut river at Brattleboro in said state to its mill at Hinsdale in the state of New Hampshire. The boom at the mill was incapable of holding the wood at flood stages of the Connecticut river, and much of it would have been lost if placed there under such conditions. Near the mouth of the West river in the state of Vermont, and within the town of Brattleboro, was a considerable pond, and here plaintiff maintained a boom for the purpose of holding said timber during high water. On March 25, 1919, the putting of its wood in the West river was started and a portion of it reached the town about March 27th, but, because of high water, was not moved forward until April 3d. Up to that time less than half of the 10,000 cords had reached Brattleboro. On March 28th the boom broke and allowed some of it to escape onto a meadow near the mouth of the river. The boom was repaired on March 29th, but at that time the part of the river called the "holding ground" was frozen so that the wood could not be continued on its journey. It remained on the meadow for about two weeks after the boom was cut and floating recommenced to destination and had to be pulled back by a process called booming. The town of Brattleboro demanded payment of a local tax, which was done under protest, and suit was brought by the complainant to recover. The Supreme Court of Vermont rejected the claim upon the ground that the pond at Brattleboro amounted to a gathering station for the timber and the interstate journey did not actually begin until it had started down the Connecticut river. However, in reversing that decision, the Supreme Court of the United States, through the present Chief Justice, had this to say:

"The question here then is: Where did the interstate shipment begin? When the wood was placed in the waters of the West river in the towns of Jamaica, Strafton, Londonberry and Winhall, or at the boom in Brattleboro? The whole drive was ten thousand cords. Six thousand cords of that, shipped from these towns after the 3d of April, went through directly to Hinsdale, N. H., without stopping. Certainly that was a continuous passage and the wood when floating in the West river was as much in interstate commerce as when on the Connecticut. Why was it any more in interstate commerce than that which had been shipped before April 3d from the same towns for the same destination by the same natural carrying agency, to wit, the flowing water of the West and Connecticut rivers? Did the fact that before April 3d the waters of the Connecticut were frozen, or so high as to prevent the logs reaching Hinsdale, requiring a temporary halting at the mouth of the West river, break the real continuity of the interstate journey? We think not. The preparation for the interstate journey had all been completed at the towns on the West river where the wood had been put in the stream. The boom at the mouth of the West river did not constitute an entrepot or depot for the gathering of logs preparatory for the final journey. It was only a safety appliance in the course of the journey. It was a harbor of refuge from danger to a shipment on its way. It was not used by the owner for any beneficial purpose of his own except to facilitate the safe delivery of the wood at Hinsdale on their final journey already begun. The logs were not detained to be classified, measured, counted or in any way dealt with by the owner for his benefit, except to save them from destruction in the course of their journey that, but for natural causes, over which he could exercise no control, would have been actually continuous. This was not the case in Coe v. Errol. It is evident from the statement of that case, and Mr. Justice Bradley's language, that the logs were partly drawn and partly floated to Errol and deposited some in the stream and some on the banks, where 'they were to remain until it should be convenient to send them to their destination,' and they were being gathered there for the whole previous winter season. It was an entrepot or depot as the justice several times describes it. The mere fact that the owner intended to send them out of the state under such circumstances did not put them into transit in interstate commerce. But here, we have the intention put into accomplishment by launching, and manifested by an actually continu-

ous journey of more than half the drive, with a halting of less than half of it in the course of the interstate journey to save it from loss, and only for that purpose."

It is thus seen that the court pitched its conclusion upon the proposition that the slight interruption in the interstate journey was caused by the necessities of the case, conditions over which the shipper had no control, and without any element of convenience or choice on its part. Whereas, in the present case, the complainant built the large number of tanks and used them for its own convenience. In other words, when it decided to enter the Claiborne field, it knew that it would have to provide storage facilities to take care of the flush production until means could be had to transport it, and to my mind the situation is no different from what it would have been had this tank farm been constructed at Ferguson instead of Dubberly and the oil held until the interstate journey had actually started. Complainant found it more convenient to build them at Dubberly, and the oil was collected and stored there until the pipe line could be built for pumping it on to the refinery at Port Arthur. Then, after the line was extended, it continued to receive and store for varying periods larger quantities than could be passed through the line south; the average on hand daily being approximately 40 to 50 times the quantity which could be pumped. The idea that this was a gathering station is very forcefully illustrated by the fact that the intake pipe to the tank farm had a capacity double that of the outflow.

In my opinion, the case just analyzed comes nearer in its facts to those under consideration than any of the others cited. Many of the latter involved attempts to interfere with interstate commerce by regulations and restrictions upon the business of dealing in particular kinds of property such as cattle, wheat, etc., while in the course of trade between the several states, and which, of course, is a power specifically delegated to Congress. Eureka Pipe Line v. Hallenan and United Fuel & Gas Company v. Same were in the nature of license taxes upon the business of the complainants. The difference between a license tax and a property tax is of course important. As was said by the Supreme Court in Wells Fargo & Company v. Nevada, 248 U. S. 165, 39 S. Ct. 62, 63 L. Ed. 190:

"The difference is vital, for, consistently with the commerce clause of the federal Constitution, the state could not tax the privilege or act of engaging in interstate commerce,

but could tax the company's property within the state, although chiefly employed in such commerce."

And again, in St. Louis, etc., v. Missouri, 256 U. S. 314, 41 S. Ct. 488, 65 L. Ed. 946:

"Slightly condensed, it is that, while a state may not, in the guise of taxation, constitutionally compel a corporation to pay for the privilege of engaging in interstate commerce, yet this immunity does not prevent the state from imposing an ordinary property tax upon property having a situs within its territory and employed in interstate commerce. Even the franchise of a corporation, if not derived from the United States, although that franchise is the business of interstate commerce, is subject to state taxation as a part of its property."

The taxes sought to be imposed in the present case are clearly property taxes, and if the oil had not started in interstate commerce, or if it had, and there had been such an interruption of the journey as to give it a situs in Webster parish, then it was liable to local taxation. An illustration of the first kind of cases—that is, where the journey had not commenced—is Coe v. Errol, 116 U. S. 517, 6 S. Ct. 475, 29 L. Ed. 715; while among those involving an interruption are to be found General Oil Company v. Crain, 209 U. S. 211, 28 S. Ct. 475, 52 L. Ed. 754; American Steel & Wire Company v. Speed, 192 U. S. 501, 24 S. Ct. 365, 48 L. Ed. 538, and Bacon v. Illinois, 227 U. S. 504, 33 S. Ct. 299, 57 L. Ed. 615. In the case of General Oil Company v. Crain, Inspector, it was said:

"We are brought, then, to consider whether the law would, if administered against the oils in controversy, violate any constitutional right of plaintiff in error.

"As determining an affirmative answer to this question, it is contended that the oil in both tanks was in transit from the place of manufacture, Pennsylvania, to the place of sale, Arkansas. The delay at Memphis, it is urged, was merely for the purpose of separation, distribution and reshipment, and was no longer than required by the nature of the business and the exigencies of transportation. The difference in the oil in tank No. 1 and that in tank No. 2, it is further said, is that the former was sold before shipment, and the latter was to be held in Tennessee for sale, but in neither case was the oil to be sold in Tennessee, and it is hence insisted that the interstate transit of the oil was never finally ended in Memphis, but was only temporarily interrupted there.

"The beginning and the ending of the

transit which constitutes interstate commerce are easy to mark. The first is defined in Coe v. Errol, 116 U. S. 517, to be the point of time that an article is committed to a carrier for transportation to the state of its destination, or started on its ultimate passage. The latter is defined to be in Brown v. Houston, 114 U. S. 622, the point of time at which it arrives at its destination. But intermediate between these points questions may arise. State v. Engel, 5 Vroom (N. J.) 435; State v. Carrigan, 10 Vroom (N. J.) 35; The Daniel Ball, 10 Wall. 557.

"In Pittsburg Coal Company v. Bates, 156 U. S. 577, coal in barges shipped from Pittsburg, Pa., to Baton Rouge, La., was stopped about nine miles above destination. It was held that it had ceased to be interstate commerce, and was subject to taxation by the state of Louisiana.

"In Diamond Match Company v. Ontonagon, 188 U. S. 82, logs in transit to a point without the state were held subject to taxation under a statute of the state where they would 'naturally leave the state in the ordinary course of transit.'

"'In Kelley v. Rhoads, 188 U. S. 1, a flock of sheep driven from a point in Utah across Wyoming to a point in Nebraska for the purpose of shipment by rail from the latter point was held to be property engaged in interstate commerce and exempt from taxation by Wyoming under the statute taxing all live stock brought into the state 'for the purpose of being grazed.' There was no difficulty in the case except that which arose from the contention that the manner of transit was adopted as an evasion of the statute. Otherwise the grazing of the sheep was as incidental as feeding them would be if transported by rail. The pertinence of the case to the present controversy is in its summary of the principles of prior cases expressed in the following passage: 'The substances of these cases is that, while property is at rest for an indefinite time awaiting transportation, or awaiting a sale at its place of destination, or at an intermediate point, it is subject to taxation. But if it be actually in transit to another state, it becomes the subject of interstate commerce and is exempt from local assessment.' Property, therefore, at an intermediate point between the place of shipment and ultimate destination may cease to be a subject of interstate commerce. Necessarily, however, the length and purpose of the interruption of transit must be considered.

"In State v. Engle, Receiver, etc., 5 Vroom (N. J.) 425, 435, where coal mined in Pennsylvania was sent by rail to Elizabethport, in New Jersey, where it was deposited on the wharf for separation and assortment for the purpose of being shipped by water to other markets for the purpose of sale, it was held that the property was not subject to taxation in New Jersey. The court said: 'Delay within the state, which is no longer than is necessary for the convenience of transhipment for its transportation to its destination, will not make it property within the state for the purpose of taxation.' See also State v. Carrigan, 10 Vroom (N. J.) 36, where coal also shipped from Pennsylvania to a port in New Jersey and remaining there no longer than was necessary to obtain vessels to transport it to other places was held to be in course of transportation and not subject to the taxing power of the State. In Burlington Lumber Co. v. Willetts, 118 Illinois, 559, the principle was recognized that property in transitu was not subject to the taxing power of a state, but it was held that logs in rafts sent from Wisconsin to Burlington, Iowa, by the Mississippi river, a part of which were stopped at a place in Illinois called Boston Harbor, to be there kept until needed at Burlington for mill purposes, were subject to taxation. The court said that the property was 'kept at New Boston on account of the profit of the owners to keep it there,' and further, that the company was engaged in business in the state beneficial to itself, and its property was so located as to claim the protection of the laws of the state and hence was liable to taxation.

"Like comment is applicable to plaintiff in error and its oil. The company was doing business in the state, and its property was receiving the protection of the state. Its oil was not in movement through the state. It had reached the destination of its first shipment, and it was held there, not in necessary delay or accommodation to the means of transportation, as in State, etc., v. Engle, supra, but for the business purposes and profit of the company. It was only there for distribution, it is said, to fulfill orders already received. But to do this required that the property be given a locality in the state beyond a mere halting in its transportation. It required storage there—the maintenance of the means of storage, of putting it in and taking it from storage. The bill takes pains to allege this. 'Complainant shows that it is impossible, in the coal oil business, such as complainant carries on, to fill separately each of these small orders directly from the railroad tank cars, because of the great delay and expense in the way of freight

charges incident to such a plan, and for the further reason that an extensive plant and apparatus is necessary, in order to properly and conveniently unload and receive the oil from said tank cars, and it would be impracticable, if not impossible, to have such apparatus and machinery at every point to which complainant ships said oil.'

"This certainly describes a business—describes a purpose for which the oil is taken from transportation, brought to rest in the state and for which the protection of the state is necessary, a purpose outside of the mere transportation of the oil. The case, therefore, comes under the principle announced in American Steel & Wire Co. v. Speed, 192 U. S. 500.

"We have considered this case so far in view of the cases which involve the power of taxation. It may be that such power is more limited than the power to enact inspection laws. Patapsco Guano Co. v. Board of Agriculture, 171 U. S. 345, 356. The difference, if any exists, it is not necessary to observe. The cases based on the taxing power show the contentions of plaintiff in error are without merit; in other words, show that its oil was not property in interstate commerce."

I also quote at length from the case of Bacon v. Illinois, as follows:

"The following facts are shown by the agreed statement: The grain had been shipped by the original owners who were residents of southern and western states, under contracts for its transportation to New York, Philadelphia and other eastern cities which reserved to the owners the right to remove it from the cars at Chicago 'for the mere temporary purposes of inspecting, weighing, cleaning, clipping, drying, sacking, grading or mixing, or changing the ownership, consignee or destination' thereof. While the grain was in transit it was purchased by Bacon, the plaintiff in error, who succeeded to the rights of the vendors under the contracts of shipment. He was represented at the points of destination by agents through whom he disposed of grain and other commodities on the eastern markets, and the grain in question was purchased by him solely for the purpose of being sold in this way and with the intention to forward it according to the shipping contracts; it was not his intention to dispose of it in Illinois. Upon the arrival of the grain in Chicago, Bacon availed himself of the privilege reserved and removed it from the cars to his private elevator. This removal, it is said in the agreed statement of facts, was for the sole purpose of inspecting, weighing, grading, mixing, etc., and not for the purpose of changing its ownership, consignee or destination. It is added that the grain remained in the elevator only for such time as was reasonably necessary for the purposes above mentioned, and that immediately after these had been accomplished it was turned over to the railroad companies and was forwarded by them to the eastern cities in accordance with the original contracts of transportation. No part of the grain was sold or consumed in Illinois. It was while it was in Bacon's elevator in Chicago that it was included in the assessment as a part of his personal property.

"But neither the fact that the grain had come from outside the state nor the intention of the owner to send it to another state and there to dispose of it can be deemed controlling when the taxing power of the state of Illinois is concerned. The property was held by the plaintiff in error in Chicago for his own purposes and with full power of disposition. It was not being actually transported and it was not held by carriers for transportation. The plaintiff in error had withdrawn it from the carriers. The purpose of the withdrawal did not alter the fact that it had ceased to be transported and had been placed in his hands. He had the privilege of continuing the transportation under the shipping contracts, but of this he might avail himself or not as he chose. He might sell the grain in Illinois or forward it as he saw fit. It was in his possession with the control of absolute ownership. He intended to forward the grain after it had been inspected, graded, etc., but this intention, while the grain remained in his keeping and before it had been actually committed to the carriers for transportation, did not make it immune from local taxation. He had established a local facility in Chicago for his own benefit and while, through its employment, the grain was there at rest, there was no reason why it should not be included with his other property within the state in an assessment for taxation which was made in the usual way without discrimination. Woodruff v. Parham, supra; Brown v. Houston, supra; Coe v. Errol, supra; Pittsburgh & Southern Coal Co. v. Bates, 156 U. S. 577; Diamond Match Co. v. Ontonagon, supra; American Steel & Wire Co. v. Speed, supra; General Oil Co. v. Crain, supra.

"The question, it should be observed, is not with respect to the extent of the power of Congress to regulate interstate commerce,

but whether a particular exercise of state power in view of its nature and operation must be deemed to be in conflict with this paramount authority. American Steel & Wire Co. v. Speed, supra, pages 521, 522. Thus, goods within the state may be made the subject of a nondiscriminatory tax though brought from another state and held by the consignee for sale in the original packages. Woodruff v. Parham, supra. In Brown v. Houston, supra, the coal on which the local tax was sustained had not been unloaded, but was lying in the boats in which it had been brought into the state and from which it was offered for sale. In Pittsburgh & Southern Coal Co. v. Bates, supra, coal had been shipped from Pittsburgh to Baton Rouge in barges which, to accommodate the owner's business, had been moored about nine miles above the point of destination. The coal while remaining on the barges under these conditions was held subject to taxation. In General Oil Co. v. Crain, supra, the oil which had been brought from Pennsylvania to Memphis, a distributing point, was held in tanks, one of which was kept for oil for which orders had been received from Arkansas, Louisiana and Mississippi prior to the shipment from Pennsylvania, and which had been shipped especially to fill such orders. The tank was marked, 'Oil Already Sold in Arkansas, Louisiana and Mississippi.' The local tax upon this oil, which remained in Tennessee only long enough (a few days) to be properly distributed according to the orders, was sustained.

"In the present case the property was held within the state for purposes deemed by the owner to be beneficial; it was not in actual transportation; and there was nothing inconsistent with the federal authority in compelling the plaintiff in error to bear with respect to it, in common with other property in the state, his share of the expenses of the local government."

It so happens that in the present cases the complainant was both owner and carrier of the oil, but this can make no difference. If, instead, the pipe line had been a common carrier and the oil had been pumped into the tanks at Dubberly and shipped out as was done, the case could hardly be distinguished in principle from the one last quoted. In the latter, wheat was handled not only with the intention but under contracts of transportation to be carried to the eastern markets in other states; but since the interruption was for the shipper's benefit, who might have sold it at that time, the court found that the interstate journey had been broken and upheld the tax. What was said there is equally applicable here, for not only was the holding voluntary and for complainant's benefit, but it did actually sell from Dubberly in the first two years of its operations a half million barrels of this oil. In other words, although property may be taken from the stream of commerce only for a short while, nevertheless, if done under such circumstances, it thereby becomes part of the mass of property within the local jurisdiction subject to taxation.

My conclusion, therefore, is that the facts do not warrant my finding the tax was laid upon property in interstate commerce. The basis of assessment was not unreasonable, but the same as was used with respect to all other property under similar circumstances.

[3] With regard to the alleged fraudulent or oppressive purpose in creating the Dubberly school district No. 27, I do not believe that the facts sustain that contention. The matter, by the Constitution and laws of the state, is left to the discretion of the school authorities, subject to the approval of the property taxpayers qualified to vote under the law, and I am convinced that all requirements to that end have been complied with. If they found that the taxable property justified the issuance of the bonds (and that of complainant has been lawfully included therein), the courts would not be authorized to substitute their judgment for that of such officers as to the amount, length of time, etc., within which the obligations should be paid.

## Decree.

As to suit No. 196, I think I am justified in exercising the discretion which seems to be vested in me to reopen the case for the purpose of permitting the proof sought by respondent's motion to that end. The point of the alleged insufficiency of the school board's record to establish an actual levy of the taxes does not appear to have been fully disclosed until after the evidence had been taken and the case submitted. I therefore believe the ends of justice require that respondent be given an opportunity to offer this additional evidence if it is to be had.

With regard to suit No. 199, I cannot assume that the assessor will pursue any different course in assessing complainant's property from that used for the preceding years. If any condition should arise whereby it might be prejudiced in that respect, it will have the right to apply first to the assessing agencies of the state, and, if denied

relief, then to the proper courts for protection.

It is therefore ordered that suit No. 196 be reopened in accordance with the prayer of respondent's motion, and that suit No. 199 be, and the same is, dismissed, at complainant's cost.

### On Rehearing.

This case was reopened for the purpose of permitting the respondent to prove the passage of the ordinance levying the tax by introducing evidence to show that, although the language of the ordinance of the school board did not affirmatively disclose its adoption, nevertheless same was actually done and the property entered upon the assessment roll accordingly. I think the evidence offered on the new trial fully sustains the contention that the tax was properly levied.

The only other question which has given me concern upon the rehearing is as to whether the assessment should be reduced to the extent of the oil contained in the tanks necessary for the operation of the pumping station. After further consideration, I am of the opinion that at least two of the tanks were necessary for this purpose, and that the assessment should be reduced by the amount of the daily average of oil contained in the tanks, Nos. 966 and 967 during 1922, the year upon which the assessment for 1923 was based. This was 18,278 and 31,917 barrels, respectively, which, at $1.65 per barrel, makes the sum of $82,811.75. The assessment made by the board was $778,165, which should be reduced to $695,353.25, and upon which the taxes levied should be collected. Western Union Telegraph Company v. Ratterman, 127 U. S. 411, 8 S. Ct. 1127, 32 L. Ed. 229.

The Act 170 of 1898, known as the Revenue Law of the State of Louisiana for that year, imposes certain penalties and attorneys fees upon those who enjoin the collection of a tax, and I think the facts in this case warrant the assessment of the same against the complainant. Under this statute and subsequent amendments, unless the assessment is reduced as much as 25 per cent., the penalties and fees have to be paid. The injunction should therefore be sustained as to the average daily contents of the tanks Nos. 966 and 967, or, say, 50,195 barrels at the rate of $1.65 per barrel, and otherwise the demand of plaintiff should be rejected and the bill dismissed. The costs should be paid in the proportion of fifteen-seventeenths by complainant and two-seventeenths by respondent.

Let there be judgment accordingly.