## MISSOURI PAC. R. CO. v. SCHNIPPER, County Treasurer, et al.

### No. 4573.

Circuit Court of Appeals, Seventh Circuit.
Feb. 17, 1932.

Rehearing Denied March 18, 1932.

Josiah Whitnel, of East St. Louis, Ill., and James M. Chaney, of St. Louis, Mo. (Edward J. White, of St. Louis, Mo., of counsel), for appellant.

F. J. Tecklenburg, of Belleville, Ill., for appellees.

Before ALSCHULER and EVANS, Circuit Judges, and LINDLEY, District Judge.

EVANS, Circuit Judge.

To restrain the collection of a tax levied against some 300,000 ties owned by appellant, this suit was brought. The right to levy the tax upon the ties, which were located in St. Clair county to be creosote-treated, was

challenged by appellant on the ground that the ties were, when assessed, being transported in interstate commerce. Appellees denied that the ties were a subject of interstate commerce or were in transportation in interstate commerce when they were assessed for local taxes. The District Court found for defendants and dismissed the suit. Its statement is accepted by both parties as fair and complete. We quote therefrom:[1]

In disposing of the case, the court, after reviewing the numerous decisions dealing with similar questions including Woodruff v. Parham, 8 Wall. 123, 19 L. Ed. 382; Coe v. Errol, 116 U. S. 517, 6 S. Ct. 475, 29 L. Ed. 715; Brown v. Houston, 114 U. S. 622, 5 S. Ct. 1091, 29 L. Ed. 257; Diamond Match Co. v. Ontonagon, 188 U. S. 82, 23 S. Ct. 266, 47 L. Ed. 394; Swift & Co. v. U. S., 196 U. S. 376, 25 S. Ct. 276, 49 L. Ed. 518; Texas & New Orleans R. R. Co. v. Sabine Tram Co., 227 U. S. 111, 33 S. Ct. 229, 57 L. Ed. 442; Bacon v. Illinois, 227 U. S. 504, 33 S. Ct. 299, 57 L. Ed. 615; Champlain Realty Co. v. Brattleboro, 260 U. S. 366, 43 S. Ct. 146, 67 L. Ed. 309, 25 A. L. R. 1195; Hughes Bros. Co. v. Minnesota, 272 U. S. 470, 47 S. Ct. 170, 71 L. Ed. 359; Carson Petroleum Co. v. Vial, 279 U. S. 95, 49 S. Ct. 292, 73 L. Ed. 626, said:

" * * * the controlling principle * * * is, that any interruption of the movement of commodities at an intermediate point between origin and final destination that is not incidental to the transportation or the use of the means of transportation, or being so incidental, is used or extended for purposes of the owner not incidental to the transportation or the means used therefor, breaks the continuity in transit and subjects the shipment to local taxation at the point of interruption. * * *

"A review of the evidence * * * convinces me that while the primary purpose of the withdrawal of the ties from transportation at the T. J. Moss Tie Company plant was to procure their treatment with creosote * * * the plaintiff extended and made use of the stop-over for business purposes, advantageous to itself, that were neither incidental to the transportation nor to a procurement of the treatment of the ties which was the sole privilege under the rate schedule.

[1] "* * * The Missouri Pacific Railroad Company [does] * * * business under the laws of the state of Missouri with lines of railroad in various states, including Illinois, Missouri, and Arkansas. It purchases * * * in Louisiana, Oklahoma, Arkansas, and Missouri cross-ties for use in building and maintaining its lines of railroad * * *. At the beginning of each year * * * complainant, after receiving reports from maintenance of way officials and employees on the various districts and divisions of the railroad, prepare * * * estimates of the number and classes of ties that will be required during the year on the respective divisions * * *. Based on the estimates * * * the company proceed to make contracts for ties at available points in Arkansas, Louisiana, Oklahoma, and Missouri. * * * Ties are accumulated on complainant's lines in said states, inspected and received. Thereafter they are shipped * * * to the plant of the T. J. Moss Tie Company at Valley Junction, Ill., where they are treated with creosote, and thence, after treatment, to various points on complainant's lines for use. The complainant neither buys nor owns any ties for re-sale nor for any purpose other than for its own use. When shipments of ties are made from point of origin to the creosoting plant, the final destination beyond the plant of neither the shipment nor of any tie in the shipment has been definitely determined. It is known, however, that the ties made of certain woods will go to certain divisions for certain specific uses, and that all will be forwarded after treatment from the plant for use at some point on complainant's lines pursuant to the intention at time of shipment. The ties are carried into and out of the plant by the complainant on its own rails. At the plant the complainant maintains a supervisor who records the shipments in and out. At the first of each month he receives from the complainant's general office a set-up for shipment of ties from the plant during the month corresponding to complainant's requirements on the various operating divisions, which he fills out of complainant's ties at the plant, which have been treated and are ready to be moved. In addition to recording and supervising the incoming and outgoing shipments of ties, the supervisor superintends the delivery of ties to the plant for treatment and determines whether the ties, when received at the plant, are ready for treatment or must be yarded for drying or air seasoning. Ties cannot be treated until thoroughly air-seasoned. Air-seasoning of a tie is shown by the evidence to require from three to nine months. When received at the plant some of the ties are air-seasoned and the remainder are in varying stages of air-seasoning. The unseasoned ties must be, and are, stacked in the yards until properly seasoned. Wet ties must be yarded until dry. A tie which is dry and properly seasoned can be treated with creosote in the course of a few hours.

"About 20 per cent. of the ties, upon arrival at the plant, are treated immediately and shipped out as soon as treated. The others remain in the yards for varying periods of time. The average length of time the ties remain in the plant or the yards of the plant is more than three months, but not more than four months. The records of the tie company show that some ties remain at the plant for a period of a year or more and very considerable numbers for varying periods in excess of six months. It is estimated that the number of complainant's ties at the * * * Moss Tie Company plant maintain an approximate average throughout the year of 300,000, with a fairly equal number coming in and going out in the course of the year. There is frequently a great variance, however, between the number coming in during a given month, or other given period within a year, and the number going out in the course of the same period. The ties treated at this plant are used in Illinois, Missouri, and other states but the evidence does not disclose what proportion of the ties are used in Illinois and what proportion elsewhere.

"A duly published through rate from point of origin to final destination, with privilege of stop-over in transit for creosoting treatment at the T. J. Moss Tie Company plant, is applied to the movement of all the ties in question under provisions of tariffs duly published by authority of the Interstate Commerce Commission."

"The testimony ＊ ＊ ＊ conclusively shows that ＊ ＊ ＊ complainant, in practice, extended the interruption of the transportation of the ties at the ＊ ＊ ＊ Moss ＊ ＊ ＊ plant beyond the time reasonably necessary to have the ties treated with creosote; that the extension was for purposes not incidental to the treatment of the ties and was made use of by the complainant as a business facility and convenience as follows: first, for sorting the seasoned ties from the un-seasoned ties and otherwise using the grounds of the tie plant as a point for assembling and sorting the ties; second, for stacking the unseasoned ties in the yards for such periods before creosoting as was necessary for nature to put them into a completely seasoned . condition ready for treatment; third, for storage of the ties in the yards of the plant until needed to meet the maintenance and construction requirements of the complainant as indicated by the monthly set-ups for shipment furnished by the complainant to its supervisor at the plant. ＊ ＊ ＊ "

If the evidence warranted the court's deduction that the ties were delayed at the Moss plant beyond the time necessary for their proper creosoting and such extension of time was for the complainant's business convenience—namely, to await orders from local divisions—the conclusion as to liability for local taxes seems unavoidable.

From our examination of the evidence, we are satisfied that the court's finding on this issue cannot be disturbed. The fact that ties in some instances were kept in the Moss plant over a year gives rise to the inference that the company was awaiting orders from local divisions before creosoting the ties so ordered. Moreover, the testimony of one of complainant's witnesses that, "The ties are used as we need them," supports this deduction.

The decree is affirmed.