**SOUTHERN PAC. CO. v. VAN HOOSEAR.**
**No. 7014.**

Circuit Court of Appeals, Ninth Circuit.
Sept. 13, 1934.

*Rehearing denied Nov. 5, 1934.

James E. Lyons and Harry H. McElroy, both of San Francisco, Cal., for appellant.

Carl R. Schulz, of San Francisco, Cal., for appellee.

Before WILBUR, SAWTELLE, and MACK, Circuit Judges.

MACK, Circuit Judge.

In an action for freight charges on shipments of commodities from the wharves at San Francisco to the appellee's mills in the same city, appellant sought to recover $1,195.96 with interest, on the theory that interstate and not intrastate rates were applicable. Appellee admitted an indebtedness of $593.70, based on the intrastate rate, and denied that he had ever refused to pay that sum. The court, after trial without a jury, first gave judgment for the plaintiff for $1,189.96 with interest and costs, but, on defendant's motion for a new trial, set it aside and, without special findings, entered judgment for defendant, overruling plaintiff's motion for judgment in its favor in the sum of $1,189.96 with interest. Whether the trial judge based his conclusion on the validity of the defense of res adjudicata, or on the view that plaintiff had failed to establish such facts as made interstate rates applicable, is not apparent. If the judgment was justifiable on either ground, it must, therefore, be affirmed.

1. The defense of res adjudicata is based on a prior decision of the California Railroad Commission, a review of which was denied by the California Supreme Court. Appellee for years had paid the interstate rate on similar shipments and, on discovering that the intrastate rate was lower, sued for a refund before the Railroad Commission. The Commission held the shipments to be intrastate, granted reparation, and ordered the carrier

to abstain from collecting for the transportation of complainant's similar shipments other than the intrastate tariff charges. None of the shipments involved in this action could have been included in those for which reparation was awarded by the Commission. Only three of those mentioned in the exhibit attached to the complaint herein are among those mentioned in the case before the Commission, and as concededly no freight had been paid on them, no reparation could have been awarded.

But all of these shipments had been made about the same time or shortly after those involved in the Commission's order. Consequently the defense of res adjudicata rests upon the similarity in the character of the shipments as interstate or intrastate commerce and not upon their identity in the two cases.

It is not essential that the trial court must necessarily have found the facts before the Commission and before the court as to the character of the shipments to be substantially similar; it suffices, with jury waived, that he was justified in so finding them on a comparison of the facts as stated in the Commission's opinion with the evidence in the case before him. The denial of a review by the State Supreme Court, to which application had been made pursuant to Gen. Laws Cal. 1931, title 464, Act 6386, § 67, is efficacious as an affirmance, to give finality to the Commission's order and to render it res adjudicata. Napa Valley Electric Co. v. Railroad Comm. of Calif., 251 U. S. 366, 40 S. Ct. 174, 64 L. Ed. 310 (1920). See, too, Adams v. Decoto, 21 F.(2d) 221 (1927 S. D. Cal., a three-judge case). Wallace Ranch Water Co. v. R. R. Comm. (C. C. A.) 47 F.(2d) 8.

This court has recently held that a reparation award made by the Department of Public Works of Washington under an analogous statute and affirmed by the Supreme Court of that state was not res adjudicata on the merits of the controversy as to whether the commerce was inter or intrastate. Chicago, M., St. P. & P. R. Co. v. Campbell River Mills Co. (C. C. A.) 53 F.(2d) 69 (1931). That decision, however, was based upon decisions of the Washington courts that the merits of the Department's award could not be considered on appeal therefrom but would be open for trial in a subsequent suit to enforce the award. In Stratton v. Railroad Commission, 186 Cal. 119, 198 P. 1051, 1054 (1921), the Commission had held in an earlier case that a certain water company was a public utility, but had denied the relief asked against

it. As against the contention that this decision of the Commission was res adjudicata as to the character of the company, the court said: "There is more than one answer to this, but one alone need be given. It is that the Commission is not a judicial tribunal in the strict sense, although many of its functions are quasi judicial, so that its orders are not judgments, and in particular its findings of fact are not adjudications, and facts found by it are not res judicata and as such finally and conclusively established between the parties for all purposes." But as the court pointed out in Southern Pac. Co. v. Railroad Commission, 194 Cal. 737, 231 P. 28, 29 (1924), a reparation case: "Legislative and judicial powers were in some instances united in the same tribunal. * * * The Railroad Commission of California is such a body. * * * There is a distinction between the power to fix rates and the power to award reparation. The former is a legislative function, the latter is judicial in its nature."

Appellant contends that the Commission's order must be deemed to relate only to that class of commerce of which it has jurisdiction and not to commerce that this court finds to be interstate. But res adjudicata is none the less applicable when a jurisdictional question is at issue. Cf. American Surety Co. v. Baldwin, 287 U. S. 156, 53 S. Ct. 98, 77 L. Ed. 231, 86 A. L. R. 298 (1932); Baldwin v. Iowa State Traveling Men's Ass'n, 283 U. S. 522, 51 S. Ct. 517, 75 L. Ed. 1244 (1931); Grubb v. Public Utilities Commission of Ohio, 281 U. S. 470, 50 S. Ct. 374, 74 L. Ed. 972 (1930).

Appellant contends, however, that the doctrine is in any event inapplicable here because the shipments are not identical. This argument does not, however, meet the classic statement of the Supreme Court that a "right, question, or fact distinctly put in issue, and directly determined by a court of competent jurisdiction, as a ground of recovery, cannot be disputed in a subsequent suit between the same parties or their privies; and, even if the second suit is for a different cause of action, the right, question, or fact once so determined must, as between the same parties or their privies, be taken as conclusively established, so long as the judgment in the first suit remains unmodified." Southern Pacific R. Co. v. United States, 168 U. S. 1, 48, 18 S. Ct. 18, 27, 42 L. Ed. 355 (1897).

"The estoppel of a judgment is not confined to matters purely of fact or of mixed law and fact, but extends to a decision of the legal rights of the parties on a state of facts common to both suits, although the causes of ac-

906

tion are different.". 2 Freeman on Judgments (5th Ed.) § 708. But, as he states in section 709: "Decisions on mere questions of law do not operate as res judicata when divorced from the particular subject matter to which the law was applied, though they may be followed as precedents under the doctrine of stare decisis." See, too, Von Moschzisker, Res Judicata, 38 Yale L. J. 299, 302 (1929); United States v. Moser, 266 U. S. 236, 242, 45 S. Ct. 66, 69 L. Ed. 262 (1924). Here we are dealing, not with a mere question of law, but with a mixed one of law and fact, whether the commerce in each of the two sets of transactions, substantially similar, is interstate or intrastate.

Res adjudicata has often been applied in tax cases when an issue arises which has been already litigated in an action concerning taxes for previous years. In Deposit Bank v. Frankfort, 191 U. S. 499, 24 S. Ct. 154, 48 L. Ed. 276 (1903), an earlier decision, that there was an irrevocable contract granting the bank immunity from taxes, was held controlling. In Tait v. Western Md. R. Co., 289 U. S. 620, 53 S. Ct. 706, 77 L. Ed. 1405 (1933), the government was held estopped to question the ruling in an earlier case that a discount on the sales of bonds could be amortized against gross income. In both cases, however, there was an identical subject-matter, the same bonds and the same contract; the taxes were for different years. Similarly, in United States v. Moser, supra, although the suit was for different pay installments, the identical subject-matter concerning which the issue arose was the military service during the Civil War. But in Dennison v. United States, 168 U. S. 241, 18 S. Ct. 57, 42 L. Ed. 453 (1897), a similar rather than identical subject-matter was involved, when the claimant sued for services rendered the government and, to the defense that the services were unauthorized, pleaded res adjudicata on the basis of a previous recovery for like services. The plea was denied because the question of authorization had not been raised in the previous case. United States v. Stone & Downer Co., 274 U. S. 225, 47 S. Ct. 616, 71 L. Ed. 1013 (1927), was on certiorari to review a judgment of the Court of Customs Appeals in the classification for duty of various importations. The contention of res adjudicata rested upon a decision of the Court of Customs Appeals in "a similar case between the same parties, involving the same questions and importations of similar merchandise." This contention was denied; but, as pointed out in Tait v. Western Md. R. Co., supra, and by this court in George H. Lee Co. v. U. S., 41

F.(2d) 460 (1930), this was on grounds peculiar to tariff litigation.

While the transactions in the instant case are many and the evidence not absolutely identical with that before the Commission, and while shipments of this character may involve variations which, though factually slight, may be of legal significance, nevertheless, in our judgment, the trial judge would have been justified in finding such similarity in the facts as to estop appellant as against appellee from denying, in view of the binding effect of the Commission's determination, approved by the California Supreme Court, that such shipments form part of intrastate and not interstate commerce. Cf. Miller Saw-Trimmer Co. v. Cheshire, 1 F.(2d) 899 (C. C. A. 7, 1924).

2. While the foregoing would suffice for affirmance, we prefer, in view of the arguments, not to rest our decision solely on the application of the principle of res adjudicata. We proceed, therefore, to consider whether there is any substantial support in the evidence for a judgment on the merits based upon a determination by a trial judge from the whole record that the shipments in question were not proven to be interstate.

Appellee is shown by the evidence to have been engaged in the business of merchandising in California spot stocks of feed and other similar commodities imported by him through the ports of Los Angeles or San Francisco from the Orient and from other places outside of California. The business was transacted in the following manner: The commodities were bought by appellee before shipment, while in transit, or after arrival at the port. The goods came by common carrier, ordinarily under an ocean bill of lading, usually with an option to consignee as to delivery, either at Los Angeles or at San Francisco. San Francisco shipments were unloaded on wharves owned by the state of California and were held there for varying lengths of time during which appellee attempted to dispose of them. Only occasionally would he sell before arrival at the port. That for which he failed to find a customer while it was at the wharf, constituting from 10 per cent. to 20 per cent. of his imports through San Francisco, was forwarded by rail from the wharf under separate rail bills of lading to his mill and warehouse in San Francisco. Most of the commodities here in question were bought by appellee before the commencement of the ocean shipment, and a few of them after arrival at the wharf; they remained on the wharf from one to fourteen days before being forwarded to appellee's

mill. The shipments were landed upon the wharves in places assigned by the Harbor Board to the steamship companies to which the charges except for demurrage were billed and under the care of whose watchman the goods remained while on the wharf. They were removed therefrom to the railroad cars on appellee's instructions by employees of a stevedoring company employed by appellee. The men loaded the goods into hand trucks and trucked them from inside the dock to the adjacent railroad cars into which they loaded them. The freight handlers received the delivery orders from appellee and gave them to the steamship company before they removed the goods from the wharf; when the car loading was completed they gave receipts for the goods to the company. The cars were then switched over the State Belt Railroad to the Southern Pacific, and thence over the Western Pacific to the mill and warehouse.

Appellant contends that, on the evidence, the court could rightly have concluded only that these rail shipments from wharf to mill were but a continuation of the one transportation beginning with the ocean voyage and ending with the delivery at the mill, and that thus they constituted a part of interstate and foreign commerce.

The primary question, therefore, for our consideration is whether or not the trial court could properly have held the shipments to involve intrastate commerce.

Appellant contends that the freight handlers' work, preparatory to and in loading into the cars, involved a delivery, actual or constructive, not to appellee, but to another transportation agency, the stevedoring company, and that consequently there was no such interruption in the transportation as to break its real continuity.

Assuming with appellant, that to end the interstate and foreign commerce and to begin the intrastate commerce, there must be a delivery to appellee, either actual or constructive, between the ocean and the rail carriage, we are satisfied that in this case the evidence justifies a conclusion of either or both. It is clear from the evidence that the transaction was not an attempted evasion of the higher charges; appellee had not known of the difference. When the goods were landed upon the wharf, the ocean shipment was completed. A receipted expense bill of one of the steamship companies bears this notice: "Cargo immediately on landing on wharf becomes 'at owner's risk.' Demurrage will be assessed on all undelivered shipments in accordance with rules and regulations of Board

of Harbor Commissioners." Appellant construes this as an admission of nondelivery. But the disclaimer of liability is more significant than the word "undelivered." The general rule that "delivery on the wharf in the case of goods transported by ships is sufficient under our law, if due notice be given to the consignees and the different consignments be properly separated, so as to be open to inspection and conveniently accessible to their respective owners," The Eddy, 5 Wall. 481, 495, 18 L. Ed. 486 (1866), is applicable. Notice and accessibility were inferable inasmuch as appellee both sorted and sold the goods on the wharf. Moreover, when the freight handlers, acting for appellee, presented the delivery orders and received and moved the goods, there was an actual delivery to appellee. In Chicago, Milwaukee & St. P. Railway Co. v. State of Iowa, 233 U. S. 334, 34 S. Ct. 592, 58 L. Ed. 988 (1914), coal was shipped from Illinois over the Rock Island and the Burlington to Davenport, Iowa, where the cars were placed on an interchange track. The shipper then tendered a written billing to the St. Paul which picked up the cars and transported them to various points in Iowa. This was held to be intrastate transportation. Chief Justice (then Mr. Justice) Hughes (page 343 of 233 U. S., 34 S. Ct. 592) adopted the finding of the Commission and the state court that the coal was originally consigned to the coal company in Davenport, that it was there held until sales were made, that the consignee had taken delivery, paying freight to the initial carrier and assuming full control.

A delivery to the shipper was assumed under analogous circumstances, when the cars were merely shifted to the tracks of another railroad and continued under a new bill of lading, in Gulf, Colorado & S. F. R. Co. v. Texas, 204 U. S. 403, 27 S. Ct. 360, 51 L. Ed. 540 (1907). Although some expressions in the opinion in this case have been criticized, its authority on the specific question of what constitutes delivery has not been shaken. Baltimore & Ohio Southwestern R. Co. v. Settle, 260 U. S. 166, 173, 43 S. Ct. 28, 67 L. Ed. 189 (1922). These cases undermine appellant's contentions that there could be no good faith delivery to appellee while the goods remained in the custody of the steamship company on the wharf and that the freight handlers could not accept delivery for him because the stevedoring company acted as a common carrier in connecting the transportation links.

Appellant contends further that the intention of the shipper when the ocean voyage

began, must be deemed immaterial as ordinarily it is unknown to the final carrier, but that, assuming its materiality, a pre-existing intention to continue transportation to some even though then uncertain destination beyond the wharf at San Francisco suffices to compel the conclusion of interstate commerce because of this linking together of the ocean and rail transportation. The significance of the intention of the shipper in determining the nature of the commerce is no longer open to question. Baltimore & Ohio S. W. R. Co. v. Settle, supra. It is also clear that an intention, when the ocean shipment begins, to distribute on landing and to reship to various points, as yet undetermined, within the state, is insufficient to unite the links into a single carriage chain. In Atlantic Coast Line R. Co. v. Standard Oil Co. of Kentucky, 275 U. S. 257, 48 S. Ct. 107, 110, 72 L. Ed. 270 (1927), oil purchased from refiners in Louisiana and Mexico was thence shipped by water to the oil company's storage tanks at the ports of Tampa and Jacksonville, Fla., and then distributed and forwarded in tank cars to the plaintiff's bulk stations at various points in Florida. These rail shipments were held to be intrastate commerce. The court said: "It seems very clear to us on a broad view of the facts that the interstate or foreign commerce in all this oil ends upon its delivery to the plaintiff into the storage tanks or the storage tank cars at the seaboard, and that from there its distribution to storage tanks, tank cars, bulk stations, and drive-in stations, or directly by tank wagons to customers, is all intrastate commerce. This distribution is the whole business of the plaintiff in Florida. There is no destination intended and arranged for with the ship carriers in Florida at any point beyond the deliveries from the vessels to the storage tanks or tank cars of the plaintiff. There is no designation of any particular oil for any particular place within Florida beyond the storage receptacles or storage tank cars into which the oil is first delivered by the ships. The title to the oil in bulk passes to the plaintiff as it is thus delivered. When the oil reaches these storage places along the Florida seaboard, it is within the control and ownership of the plaintiff for use for its particular purposes in Florida. The plaintiff is free to distribute the oil according to the demands of its business, and it arranges its storage capacity to meet the future variation in its business needs at Tampa, Port Tampa, or Jacksonville, or St. Johns river terminal." The court referred with approval to Atlantic Coast Line R. Co. v. Standard Oil Co. of New Jersey, 12 F.(2d) 541, 60 A. L. R. 1456 (C.

C. A. 4, 1926), in which the facts were similar except that the importing company shipped the oil from its own refineries in other states to its storage tanks in Wilmington, N. C., whence it was distributed to customers and substations. This indicates that a change of title at the docks is not essential to break the continuity of the commerce.

In these cases, as in the instant case, the pre-existing intention to ship beyond wharves was present. Nor can we assume that the actual period of delay between ocean and rail shipment was any longer than in this case. Appellant endeavors to distinguish them on the ground that there the delay occurred in the storage tanks of the shipper, while here the delay occurred on public wharves. In support of this distinction, it urges that storage is essential to break the continuity, when rail shipment to some point in the interior is expected to follow the water shipment, and contends, primarily on the basis of the San Francisco Harbor Regulations, that the wharves are transportation and not storage facilities. To break the transportation continuity, the goods need not be stored. Seaboard Air Line R. Co. v. Lee, 14 F.(2d) 439 (D. C. E. D. N. C., 1926), affirmed (per curiam) 276 U. S. 591, 48 S. Ct. 211, 72 L. Ed. 720 (1928). There, nitrate taken by the court as typical of several commodities, was imported from Chile through the port of Wilmington, N. C., where it was sold to retailers and dealers and thence shipped to various points within the state. As Judge Meekins, speaking for the three-judge court, said (page 442 of 14 F.(2d): "to create a distributing point, the one essential fact is distribution. Whether it be made from premises owned, leased, or merely used for this purpose, under a continuing agreement, is unimportant."

Appellant urges that the Lee Case is distinguishable in that the delivery was made to the importer at the dock where he took possession. We have already seen, however, that there was sufficient delivery in the present case to break the continuity of the commerce. A more serious distinction may be based on the fact that in the Lee Case the importer made delivery to his customers at the docks and that the Commission's order in that case was limited to further shipment by parties other than the original consignees. Whether appellee herein ordinarily made delivery to customers at the wharves is not disclosed by the record. Many of the shipments to his own mill were by "parties other than the original consignees," since appellee was seldom consignee of the ocean shipments. But in any event, this distinction is not sufficient

to justify a different result. As has often been said: "Mere billing, or the place at which title passes, is not determinative." Pennsylvania R. Co. v. Clark Bros. Coal Min. Co., 238 U. S. 456, 466, 35 S. Ct. 896, 899, 59 L. Ed. 1406 (1915). The essential fact is that appellee used the wharves as his distributing point because he held his goods there for sale. Even more clearly is this true of the present case than of the Lee Case. There the goods shipped from the dock were usually sold before arrival. Here appellee testified that "the nature of their business was to have spot stock at Los Angeles and San Francisco to merchandise after its arrival, where they could get the most for it." In such circumstances, a reshipment from the wharf to purchasers would be a new shipment, whether or not the original consignee was the new consignor and whether or not the original cargoes were broken up. Chicago, Milwaukee, St. Paul Ry. v. State of Iowa, supra. This is equally true when, as here the reshipments in question follow upon a delay made for the purpose of sale, even though, because the sale was not effected, the goods were finally shipped on to appellee's mill or warehouse.

In this conclusion, there is nothing inconsistent with the cases which have held that a pre-existing intention to export goods suffices to make the shipment from the interior of the state to the port a part of the foreign commerce. In Texas & N. O. R. Co. v. Sabine Tram Co., 227 U. S. 111, 33 S. Ct. 229, 57 L. Ed. 442 (1913), lumber was shipped from the interior of Texas to the port of Sabine for trans-shipment to Europe. When the lumber left the interior, there was only the general intention to ship it abroad; the particular destination of each shipment was not determined until its arrival at Sabine. The lumber was sold to purchasers abroad, however, before it reached Sabine; it was sent to Sabine, not for sale there, but in order to fill orders that were already received. The findings of fact disclose that when the lumber arrived at Sabine, the exporter determined whether it would suit one order or another. Such a finding closed the door to the argument that Sabine was a distributing point from which foreign sales were being made. In Southern Pacific Terminal Co. v. Interstate Commerce Commission, 219 U. S. 498, 31 S. Ct. 279, 55 L. Ed. 310 (1911), the door was at least partially closed. The court said (page 526 of 219 U. S., 31 S. Ct. 279, 287): "The purchases are made for export, there being no consumption of the products at Galveston. His sales to foreign countries are sometimes for immediate and sometimes for future delivery, irrespective of whether he has the product on hand at Galveston. At times he has it on hand. At times, therefore, orders must be filled from cake to be purchased in the interior or then in transit to him."

This, moreover, was only one of several reasons for denying the contention of the appellant in that case. In Railroad Comm. of Louisiana v. Tex. & Pac. R. Co., 229 U. S. 336, 33 S. Ct. 837, 57 L. Ed. 1215 (1913), there is no indication, in either the Supreme or the District Court opinion, that the goods were regularly sold after their arrival at the port. In Railroad Commission of Ohio v. Worthington, 225 U. S. 101, 32 S. Ct. 653, 56 L. Ed. 1004 (1912), it is true, there were findings to the effect that the coal shipped by rail from the mines to Huron and thence by boat on the Great Lakes was sometimes "sold and vessels arranged for after the coal is at Huron." That situation was complicated, however, by the fact that the intrastate rate, which the Ohio Railroad Commission sought to apply, itself linked the rail and water shipments, since it was to apply only to Lake Cargo Coal and included charges for loading the coal into the ships. The case at bar differs substantially from the foregoing cases in that appellee's sales were made principally, if not entirely, after the goods were landed on the wharves at San Francisco.

The significance of this distinction is also indicated by United States v. Erie R. Co., 280 U. S. 98, 50 S. Ct. 51, 74 L. Ed. 187 (1929). In that case, the pulp was imported by a New York broker to fill orders received from a customer at Garfield, N. J. The court held that the rail shipment from the Hoboken docks to Garfield was a part of the foreign commerce. Mr. Justice Brandeis said (page 101 of 280 U. S., 50 S. Ct. 51, 52): "The pulp destined for the company may be part of a larger shipment. But the number of bales allotted to it are always delivered at Garfield; none may be diverted to any other customer; and no pulp is shipped to the broker for sale to purchasers, to be obtained while the pulp is in transit or after its arrival." Thus, some of the very facts the absence of which was stressed in the Erie Case are here among the determinative facts.

Many of the decisions of the Interstate Commerce Commission, heavily relied upon by the appellant, support the foregoing considerations. In cases holding that the rail shipments from port to points in the interior are part of foreign commerce, the Commission has stressed the fact that the contracts of sale were made before arrival at the port.

See J. Hurt Whitehead v. Southern Ry. Co., 163 I. C. C. 405 (1930). And where goods were shipped by rail from the port, San Pedro, to the importer's own place of business at Los Angeles, the Commission has emphasized that the delay and storage were not as here for the purpose of distribution and sale. Woodhead Lumber Co. v. Pacific Electric Ry. Co., 104 I. C. C. 751 (1925); cf. Dennery v. Houston & Texas Central R. Co., 157 I. C. C. 164 (1929). Nor is the decision in Goldsboro Chamber of Commerce v. Atlantic Coast Line R. R., 91 I. C. C. 315 (1924), necessarily inconsistent with appellee's position. That case involved the same commerce as did the case of Seaboard Air Line R. Co. v. Lee, supra, although appellant may be right in its contention that the handling of the goods at the dock was different in the two cases. The Commission held that all rail shipments made directly from the shipside were import traffic, while shipments from the warehouse on the dock were intrastate. The opinion of the Commission, like that of Judge Meekins in the Lee Case, indicates that most of the shipments from shipside were sold before landing, while those from the warehouse were sold after landing.

In Feigenspan v. Central Railroad Co. of N. J., 156 I. C. C. 258 (1929), most of the coal was loaded from shipside directly into the cars for carriage to the importers' private yards; only a small proportion went to various customers; this small proportion was "incidental to the main transaction and did not affect the foreign character of the commerce."

While the Supreme Court, in Binderup v. Pathé Exchange, 263 U. S. 291, 311, 44 S. Ct. 96, 100, 68 L. Ed. 308 (1923), has said, "It does not follow that because a thing is subject to state taxation it is also immune from federal regulation under the Commerce Clause," questions of rate regulation and taxation are very intimately related. Chief Justice Taft, in Atlantic Coast Line R. Co. v. Standard Oil Co., supra, a rate case, relied partly upon a taxation case, General Oil Co. v. Crain, 209 U. S. 211, 28 S. Ct. 475, 52 L. Ed. 754, and distinguished other cases because they involved different types of regulation. He indicated, too, the controlling factors in the determination of the tax cases, in Champlain Realty Co. v. Brattleboro, 260 U. S. 366, page 377, 43 S. Ct. 146, 149, 67 L. Ed. 309, 25 A. L. R. 1195 (1922), when he said: "Chief among these are the intention of the owner, the control he retains to change destination, the agency by which the transit is effected, the actual continuity of the transportation, and the occasion or purpose of the interruption during which the tax is sought to be levied."

The sufficiency of an interruption for the purpose of sale to break the continuity has been clearly demonstrated. Brown v. Houston, 114 U. S. 622, 5 S. Ct. 1091, 29 L. Ed. 257 (1885); General Oil Co. v. Crain, 209 U. S. 211, 28 S. Ct. 475, 482, 52 L. Ed. 754 (1908). Cf. Carson Petroleum Co. v. Vial, 279 U. S. 95, 49 S. Ct. 292, 73 L. Ed. 626 (1929); Western Oil Ref. Co. v. Lipscomb, 244 U. S. 346, 37 S. Ct. 623, 61 L. Ed. 1181 (1917). In the Crain Case, oil was shipped from Pennsylvania and Ohio and stored at Memphis, Tenn., for distribution in Arkansas, Louisiana, and Mississippi. In one tank was kept the oil which was already sold when it was shipped to Memphis. In another tank was kept the oil for which orders had not yet been received when it was shipped to Memphis. The oil in both tanks was held taxable because "it was held there, not in necessary delay or accommodation to the means of transportation, * * * but for the business purposes and profit of the company."

As to the oil in the first tank, which was sold before it was shipped to Memphis, Mr. Justice Moody and Mr. Justice Holmes dissented because: "With respect to this oil, no business whatever was done in the state except that which was required to conduct the transaction of interstate commerce begun in another state and to be completed in a third state."

In the Vial Case, supra, oil was shipped from the midcontinent fields to St. Rose, La., where it was stored in tanks until it was loaded aboard tankers for shipment to foreign ports. According to the statement of facts, made by the state court and adopted by the Supreme Court: "The Carson Petroleum Company takes orders for cargoes of oil from the foreign buyers, who charter the vessels to transport the oil from St. Rose to the foreign ports. The company always has orders on hand in excess of the quantity of oil at St. Rose, and buys the oil in the Mid-Continent Field for the purpose of filling orders already received from the foreign buyers. * * * The oil is never kept on hand at St. Rose any longer than is necessary. The quantity on hand is always awaiting either the arrival of a ship or the accumulation of a sufficient quantity to load a ship."

The court held that the oil was not liable to state taxation. The opinion of the majority, without explicitly distinguishing or disapproving the Crain Case, described it as a close one that "might easily have been decid-

ed the other way," and chose to follow instead Southern Pacific Terminal v. Interstate Commerce Commission, supra, and Texas & New Orleans R. Co. v. Sabine Tram Co., supra. Mr. Justice McReynolds and Mr. Justice Sanford voted to affirm on the authority of the Crain Case. It will be noted, however, that in the Vial Case, the storage of oil was similar to that only in Tank No. 1 of the Crain Case, the oil which had been sold before and was held merely for transportation; it was to this alone that the dissent in the Crain Case applied. As to Tank No. 2, in which oil was stored while awaiting orders from other states, the authority of the Crain Case remains unchallenged. The Vial Case was decided on the authority of the Sabine Tram Co. Case, supra, because, in the words of Chief Justice Taft (page 109 of 279 U. S., 49 S. Ct. 292, 296): "The quickness of transshipment in both cases was the chief object each exporter plainly sought. In both cases the selection of the point of shipment and the equipment at that point were solely for the speedy and continuous export of the product abroad and for no other purpose."

Cf. Federal Compress & Warehouse Co. v. McLean, 291 U. S. 17, 54 S. Ct. 267, 78 L. Ed. 622 (1934) and Chassaniol v City of Greenwood, 291 U. S. 584, 54 S. Ct. 541, 78 L. Ed. —— (1934). The Sabine and the Vial Cases are clearly distinguishable in that in them the assembling of the goods at the port was not for the purpose of sale, while in the instant case they were delayed at the wharf for that very purpose. This circumstance touches the heart of the course of business and, consequently, should bulk large in the determination of the nature of the commerce. This, together with the fact that the goods were reshipped on new bills of lading without the benefit of possibly lower through rates, justifies, in the light of all the evidence, the conclusion that the rail shipments were independent acts of intrastate transportation.

3. Appellant contends that he was entitled at least to judgment for the intrastate rates, since appellee admitted liability based upon those rates in the amount of $593.70, and that its motion for judgment in its favor though specifically asking that it be in the larger sum based upon the interstate charges, nevertheless sufficed to require a judgment for the smaller amount based upon the admission. It is to be noted, however, that at no time was the judge's attention directed to the possibility of so construing the motion. This appears for the first time in the assignment of errors. Nevertheless, if the court had jurisdiction to render such a judgment and if, on the entire pleadings, it is apparent that defendant admittedly owes at least that sum, then in the interest of averting further possible litigation and of doing full justice, the error if any should be corrected.

Appellee urges that such a judgment would not be within the scope of the pleadings; that the admission of indebtedness was only a legal conclusion coupled with a denial that he had ever refused to make such payment and that there are no factual admissions concerning demand upon which to base a cause of action; further, that when the intrastate character of the commerce was determined, the basis of the court's jurisdiction disappeared, and it was consequently without jurisdiction to give judgment for the intrastate rates.

Federal jurisdiction was based upon the federal question presented by an action to recover rates established under the Interstate Commerce Act (49 USCA § 1 et seq.). When the intrastate character of the commerce was determined either as res adjudicata or as established by the evidence, no federal question remained in the case; jurisdiction to give judgment for the intrastate rates must therefore be upon the principle that the existence of a substantial federal question gave the federal court "the right to decide all the questions in the case, even though it decided the Federal questions adversely to the party raising them, or even if it omitted to decide them at all, but decided the case on local or state questions only." Siler v. Louisville & Nashville R. Co., 213 U. S. 175, 191, 29 S. Ct. 451, 455, 53 L. Ed. 753 (1909).

This principle has been most recently reinterpreted in Hurn v. Oursler, 289 U. S. 238, 53 S. Ct. 586, 77 L. Ed. 1148 (1933), a suit to enjoin the production of a play, as an infringement on plaintiff's copyrighted play and also because of unfair competition and unfair business practices resulting therefrom. The writer of this opinion, sitting in New York as the trial judge in that case, found that the copyright had not been infringed, and on the binding authority of earlier cases in the Second Circuit, contrary to some cases in which the writer had participated in other circuits, held that there was no jurisdiction to consider the charge of unfair competition. This was affirmed by the Circuit Court of Appeals in a memorandum opinion citing its earlier cases. 61 F.(2d) 1031. The Supreme Court, however, held that there was jurisdiction on the principle of the Siler Case to consider the matter of unfair competition, but held that the bill in that aspect too should be dismissed upon the merits. As Justice Suth-

erland said (page 245 of 289 U. S., 53 S. Ct. 586, 589) : "The rule does not go so far as to permit a federal court to assume jurisdiction of a separate and distinct nonfederal cause of action because it is joined in the same complaint with a federal cause of action. The distinction to be observed is between a case where two distinct grounds in support of a single cause of action are alleged, one only of which presents a federal question, and a case where two separate and distinct causes of action are alleged, one only of which is federal in character." He indicates (page 247 of 289 U. S., 53 S. Ct. 586, 590) that no "hard and fast test by which to determine in all situations what constitutes a cause of action" can be laid down.

"A 'cause of action' may mean one thing for one purpose and something different for another." United States v. Memphis Cotton Oil Co., 288 U. S. 62, 67, 53 S. Ct. 278, 280, 77 L. Ed. 619 (1933). We must look to analogies for guidance, since the Oursler Case seems to be the first in which the Supreme Court has applied the cause of action test to this jurisdictional problem. The Federal Employers' Liability Act (45 USCA §§ 51–59) cases on res adjudicata and those on the effect of the statute of limitations in its bearing on amendments aid in the solution of our problem, because in those cases as in the instant one, the plaintiff may have a good cause of action under federal law if the commerce was in fact interstate and under state law if intrastate.

In Chicago, R. I. & P. R. Co. v. Schendel, Adm'r, 270 U. S. 611, 46 S. Ct. 420, 70 L. Ed. 757, 53 A. L. R. 1265 (1926), in the state court of Minnesota, a judgment of an Iowa court, rendered under the Iowa Workmen's Compensation Law on the theory that the deceased was engaged in intrastate commerce, was held to sustain the defense of res adjudicata in an action for the same injury but based on the Federal Employers' Liability Act. The court said (page 617 of 270 U. S., 46 S. Ct. 420, 422) : "The judgment upon the point was none the less conclusive as res judicata because it was rendered under the state Compensation Law, while the action in which it was pleaded arose under the federal Liability Law."

This departure from Troxell, Adm'r, v. Delaware, L. & W. R. Co., 227 U. S. 434, 33 S. Ct. 274, 57 L. Ed. 586 (1913), was made more explicit in Baltimore S. S. Co. v. Phillips, 274 U. S. 316, 47 S. Ct. 600, 603, 71 L. Ed. 1069 (1927). There, in an action for personal injuries, the defendants pleaded res adjudicata based upon a decree in an admiralty suit for the same injuries. As the provisions of the Federal Employers' Liability Act were incorporated into the maritime law, the court said that "every ground of recovery, open to respondent in the second case, was equally open to him in the first." This line of cases clearly indicates that a change in the basis of the action from state to federal law or vice versa, particularly when the shift depends upon the interstate or intrastate character of commerce, is not the assertion of a different cause of action.

In Missouri, Kansas, & Texas R. Co. v. Wulf, 226 U. S. 570, 33 S. Ct. 135, 57 L. Ed. 355 (1913), plaintiff first based her claim for damages for her son's death on a Kansas statute. When the defendant pleaded that the accident occurred in interstate commerce, plaintiff amended her complaint so as to sue under the Federal Employers' Liability Act (45 USCA §§ 51–59). Although the amendment was made after the statutory period was over, the court held that it was not banned since it "introduced no new or different cause of action, and therefore it related back to the beginning of the suit." The principle that a "departure from law to law" in an amendment is not the statement of a new cause of action, in relation to the statute of limitation, is now firmly established. United States v. Memphis Cotton Oil Co., 288 U. S. 62, 53 S. Ct. 278, 77 L. Ed. 619 (1933), and cases cited therein. As Mr. Justice Cardozo, speaking of this problem said (page 68 of 288 U. S., 53 S. Ct. 278, 280) : "A change of the legal theory of the action, 'a departure from law to law,' has at times been offered as a test. * * * Later decisions have made it clear that this test is no longer accepted as one of general validity."

In the instant case, judgment whether for the interstate or intrastate rate would be the enforcement of but a single legal right, the right to receive compensation for the transportation service. As the federal question here presented was a substantial one (and unlike cases of diversity of citizenship, this suffices), there was no jurisdictional obstacle on this score to a judgment for the intrastate rate.

Moreover, the admission in the answer of a present indebtedness in a definite amount justifies judgment for that sum. It does not, however, permit of the allowance of interest thereon. Questions as to the effect of demand and of tender as bearing on liability for interest might be raised, if the action were brought specifically for the intrastate rate with interest.

Complete justice as between the parties will be done by affirming the judgment construing it as without prejudice to an action for the intrastate rate or, if plaintiff shall file a written request therefor within ten days, by reversing the judgment with directions to enter a judgment for plaintiff in the sum of $593.70. The costs in both courts will in either event be awarded to defendant.

