### OREGON–WASHINGTON R. R. & NAV. CO. v. FARMERS NAT. GRAIN CORPORATION.

#### No. 12005.

District Court, D. Oregon.
Nov. 22, 1937.

Roy F. Shields, of Portland, Or., for plaintiff.

John C. Veatch, of Portland, Or., for defendant.

JAMES ALGER FEE, District Judge.

This is an action at law brought by the railroad company against the Farmers National Grain Corporation to recover the interstate rates upon certain shipments of grain. There are 687 causes of action in which certain salient facts relating to each shipment are set out in the first cause of action and are incorporated by reference in all the other causes.

The 687 causes of action fall into twelve different types of classifications, the

general characteristics of which are set forth in the note appendant hereto.[1]

The complaint alleges the incorporation of plaintiff and its operation of an interstate railroad line as a common carrier in the transportation of freight and passengers between points in different states in interstate and foreign commerce, subject to the provisions of the Interstate Commerce Act, 49 U.S.C.A. § 1 et seq.; the incorporation of the defendant and the jurisdiction of this court.

As to each shipment of grain, it is alleged that it originated and was transported by the plaintiff from the initial point in the state of Oregon to Portland and delivered to the consignee at Portland Municipal Terminal No. 4. That this transportation was part of a through and continuous movement from the point of origin to a point in another state or foreign country as the ultimate destination.

That at the time said shipment was received by plaintiff at the point of origin and while same was in transit over plaintiff's line of railroad, the defendant contemplated that said shipment, upon its arrival at said Portland Municipal Terminal No. 4, would be exported in interstate or foreign commerce in pursuance to an agreement theretofore made by the defendant providing for the sale of said shipment and its delivery in such other state or foreign country, and contemplating the transportation of said shipment from its point of origin to its ultimate destination in such other state or foreign country.

It is further alleged that the shipment remained at the terminal so long "as reasonably necessary for the purposes of inspection, grading, cleaning, blending and assembling for ships' cargoes and was then actually moved by water carrier to such foreign or interstate destination".

That before the movement of the shipment there was a rate established by the Interstate Commerce Commission, covering such shipment in interstate commerce

---

[1] Class 1—Cars of which sales contracts were issued prior to arrival of shipments at Portland.

Class 2—Cars placed in grader orders for which sales contracts were issued prior to arrival of shipment at Portland.

Class 3—Cars of wheat applied on sales contracts made both prior and subsequent to arrival of shipment at Portland.

Class 4—Cars of grain placed in grader orders and applied on sales contracts made both prior and subsequent to arrival of shipments at Portland.

Class 5—Cars of grain placed in grader orders and applied on sales contracts subsequent to arrival of shipments at Portland.

Class 6—Cars of grain applied on sales contracts made subsequent to arrival of shipments at Portland.

Class 7—Cars of grain shipped on consignment contracts to Farmers National Grain Corporation and applied on sales contracts made prior to arrival of shipments at Portland.

Class 8—Cars of grain shipped on consignment contracts to Farmers National Grain Corporation and applied to sales contracts made subsequent to arrival of shipments at Portland.

Class 9—Cars of grain shipped on consignment contracts to Farmers National Grain Corporation and applied on Sales contracts made both prior and subsequent to arrival of shipments at Portland.

Class 10—Cars of grain shipped on consignment contracts to Farmers National Grain Corporation and placed in grader orders and applied on sales contracts made prior to arrival of shipments at Portland.

Class 11—Cars of grain shipped on consignment contracts to Farmers National Grain Corporation and placed in grader orders and applied on sales contracts made both prior and subsequent to arrival of shipments at Portland.

Class 12—Cars of grain shipped on consignment contracts to Farmers National Grain Corporation and placed in grader orders and applied on sales contracts made subsequent to arrival of shipments at Portland.

from the point of origin to the terminal. That under both federal and state laws the shipment was required to be officially inspected while in transit and plaintiff's "hold track" was designated the inspection point for this shipment.

That plaintiff had promulgated a tariff rate covering such shipment which contained the stipulation: "The disposition order received after the inspection will be considered as being in lieu of the consignment instructions under which the cars arrived at inspection points."

That a uniform bill of lading was issued for the shipment which contained the provision:

"Subject to Section 7 of conditions, if this shipment is to be delivered to the consignee without recourse on the consignor, the consignor shall sign the following statement:

"The carrier shall not make delivery of this shipment without payment of freight and all other lawful charges.

"_____
"Signature of Consignor."

But that this clause was not signed by the consignor or by anyone and that plaintiff transported the shipment under the terms of the transportation contract. The facts have been stipulated which establish the allegations of the complaint as to the railroad and the incorporation of the defendant.

Briefly summarized, these facts are hereinafter set forth: The capital stock of the corporation is owned by co-operative associations which are located in various grain-producing regions and are referred to as "regionals". The capital stock of "regionals" is owned by various local associations in such regions of the particular regional which are known as "locals" and that the capital stock of the "locals" is owned by individual grain producers in the various places where the "locals" are situated, and these individual producers are called "members". The defendant maintains and operates branch offices throughout the United States and has a branch office and place of business at Portland which in the year in question had agents at Seattle, San Francisco, and Los Angeles. The branch office conducts a grain business in the grain-producing region of Oregon, Washington, Northern Idaho and Western Montana. The Northern Pacific Grain

Growers incorporated a "regional" and has sixty-one "locals" throughout this region. Portland is the principal grain market of the Pacific Northwest and the junction point of the railroad carriers and the head of navigation for ocean vessels. That most of the grain produced in this region is marketed through Portland, and there are located the principal grain dealers who maintain a grain exchange for the purpose of buying, selling, optioning, and generally dealing in grain in the same general manner as grain exchanges are operated throughout the United States. The grain dealers and the city there maintain warehouses, elevators and other facilities for the storage and handling of grain among which is Terminal 4, a municipal dock and elevator, equipped for storing and handling grain and loading on water carriers. A detailed plat and description of Terminal 4 is included in the stipulation.

Numerous mills are located in Portland for the manufacture of grain into flour and other grain products for domestic and export trade. There is a constant and substantial local market at Portland for grain for milling purposes, but the largest percentage of the grain marketed there moves to points beyond the state of Oregon and most of it moves by water carrier. A part moves out by rail to points in Western Oregon and Washington but this amount is a small percentage of the grain handled in the city.

Portland is one of the principal ports of the United States for the exportation of grain. Grain purchased through this region is bought on the basis of Portland weights and grades pursuant to federal and state law. The inspectors inspect, weigh and grade each shipment upon its arrival there and the weights and grades so established are binding upon both seller and purchaser in the settlement of the purchase price. The grades so established are general grades used throughout the grain trade and there is a variation in the quality of grain classified in the same grade by the inspectors.

When the grain arrives at Portland by rail the cars are placed upon an inspection or "hold" track and the carrier notifies the consignee of such arrival. The inspectors sample and grade each car or lot of either bulk or sacked wheat but do not weigh either bulk or sacked wheat until the same is unloaded at the elevator or other storage facility and then seal and release the cars

to the carrier and the consignee instructs the carrier as to further disposition.

Upon completion of weighing and grading the inspectors furnish the consignee a certificate of inspection as to the condition of the wheat.

The defendant operates its grain business for the primary purpose of finding a market for all grain offered by its subsidiaries. Defendant notifies its "regionals" and "locals" of the market price for various varieties of grain on a particular day, and said "locals" purchase for defendant's account all grain offered for sale by "members" that day, regardless of quantity or quality and execute a purchase contract. That the "locals" notify defendant each day of the amount and variety purchased for defendant's account, and defendant forwards to the purchaser a confirmation.

Defendant then instructs said "locals" as to dispositions to be made of purchase, whether to ship immediately or store for future delivery. Defendant does not know from day to day the quantity or grade of grain it will have on hand the following day but does know approximately the quantity of grain and the general grain-producing area from which it will be obtained.

In addition to grain purchased, a large percentage of grain handled by defendant is on consignment. As a rule defendant has no knowledge of the grain consigned until after the grain arrives at Portland and does not receive the consignment agreement until several days after arrival of grain, but sometimes receives notice that such grain is in the course of transportation to Portland.

As soon as grain is received by defendant on consignment it is used or applied the same as grain purchased outright. Generally, the defendant ultimately purchases said grain although in few instances defendant has been called upon to redeliver to the seller such grain or a substitution therefor. Defendant has at all times kept itself in position to redeliver such grain or other grain in substitution in the event the consignor should so demand.

Defendant conducts an extensive grain business at Portland and sells its grain wherever it can to best advantage and always has on hand numerous sales contracts calling for delivery of a specified grade and quality. Some contracts call for delivery of a specified grade and quality at a specified time, and others call for delivery of a certain quantity of a certain grade and quality over a specified period of time. Some of defendant's sales contracts specify only a general grade of grain and some of them specify a certain protein content and others a certain protein and moisture content.

Grain of the same grade may vary widely as to protein and moisture content. Wheat of high protein content is more valuable for milling purposes and commands a higher price. The proper protein content specified in sales orders is usually obtained by mixing wheat of a high protein content with wheat of a lower protein content to obtain an average.

The inspectors, in addition to designating the grade of grain upon request of the consignee, determine and certify protein and moisture content by laboratory test.

Defendant frequently knows the approximate grade of grain prior to shipments from points of origin but does not know final grade or protein or moisture content of grain until after its arrival at Portland and grading, testing and sampling.

Defendant endeavors to keep on hand at Portland sufficient grain to meet its normal sales demand and as grain moves out on sales, the stock is replenished. It has available at Terminal 4 tanks, bins and other storage space. It places grain that is suitable to apply on sales contracts for delivery by water carrier or which it expects to sell and deliver by water carrier in the terminal.

When grain purchased or consigned has been graded, sampled and tested after arrival and is suitable to apply or can be made suitable by mixing with other grain to apply on sales contract, such application is made or the grain is stored for future application, but if defendant is able to sell such grain at a greater advantage elsewhere it sells the same and applies later grain against the contracts.

Defendant endeavors to fulfill local contracts and contracts for delivery by rail carrier with purchased or consigned grain from the "hold" track and delivers to the terminal grain as is suitable to apply on contracts or which it expects to sell and deliver by water carrier, but if defendant is unable to so apply or sell such grain on such contracts or has a demand for local or rail delivery which it cannot supply

from other sources, it uses grain from the terminal.

Grain placed in the terminal which· requires washing, cleaning, scouring, mixing with other grain, or other treatment is run through a "grader order". Each "grader order" is numbered and usually contains several cars or lots of grain, and the grain in the "grader order" may be applied on one contract or sale or may be applied on several contracts of sale or part of it transferred to another "grader order." The grain placed in said terminal may remain for a day or two or may remain several months, depending upon defendant's business demands.

Defendant can always say that certain cars or lots of grain were placed in a certain "grader order" or "grader orders" and that all the grain in such "grader order" or orders was applied on certain sales contracts, but as a rule, cannot say that any particular car or lot of grain was applied on any particular sales contract.

During the year 1932 defendant handled through Portland 384,544,245 pounds of wheat (100%). 270,891,415 pounds of this wheat (70.4%) was placed in the terminal and 113,652,830 pounds (29.6%) was sold from the "hold" track or delivered from the "hold" track against orders for rail delivery. Of wheat sold on the "hold" track, 72,652,830 pounds (18.9%) was sold for delivery by rail to points outside of the state of Oregon and 40,996,772 pounds (10.7%) was sold for delivery by rail to points within said state from the terminal. 248,585,300 pounds of wheat (64.6%) was loaded on vessels for delivery to points outside of Oregon. 12,095,615 pounds (3.1%) were for delivery to points within Oregon and 10,210,500 pounds (2.7%) were sold for delivery by rail to points without said state. (These figures were taken from the stipulation and the percentage figured upon that basis.)

The plaintiff sues on separate causes of action for each car of wheat involved for the payment of the interstate rate established on local shipments of grain by the Oregon Public Utilities Commissioner. All of the wheat contained in these carload shipments accorded with the stipulation was placed in the terminal and all moved out by water carrier to points outside the state of Oregon except certain stipulated amounts were delivered by rail from these shipments to points in the state of Washington, and more important still, certain other portions of these carload lots were delivered to points in the state of Oregon.

The issues thus made were submitted to the court without the intervention of a jury.

■ Judgment in this case must in any event be for defendant. The complaint does not state a cause of action. In this respect it is ruled by the Oregon-Washington Railroad & Navigation Company v. Strauss & Co., 9 Cir., 73 F.2d 912. That was an identical case, based upon the complaint which this court held demurrable because there was no allegation of intention upon the part of anyone at the origin of the shipment that the particular load should move in interstate or foreign commerce. Plaintiff there refused to amend, and this court entered judgment for the defendant. This ruling was affirmed upon appeal.

The present complaint is similar in allegation. There is no statement of specific intent at the initiation of the movement that the particular grain would be transported in interstate or foreign commerce. The allegation in the former complaint of knowledge upon the defendant's part that the grain would move in interstate or foreign commerce has been discarded and the present complaint alleges that the defendant "contemplated" at the initiation of this shipment that the wheat would be shipped to foreign points. But "to contemplate", according to the dictionary is:

"1. To view or to consider with continued attention; to regard thoughtfully; to meditate on; to study.

"2. Hence, to look upon (mentally); to view in a certain light or respect; to regard.

"3. To have in view as contingent or probable or as an end or intention; to look forward to; to purpose or intend.

"4. To view as an object or an objective fact; to regard with detachment." Webster's New International Dictionary —1936.

To contemplate shipping in foreign commerce does not indicate a present intention to launch the particular article upon the journey immediately.[2]

---

[2] The Supreme Court of the United States uses the word "contemplate" in just such a connection in Baltimore & O. S. W. R. Co. v. Settle, 260 U.S. 166, 173, 43 S.Ct. 28, 31, 67 L.Ed. 189:

"The mere fact that cars received on

It is obvious enough that this allegation insufficiently alleges an intent that a particular parcel, lot or shipment of grain by commitment to the common carrier should thereby be launched upon its interstate or foreign journey in continuous transportation from its initiation to its final arrival, permitting only necessary stoppages for treatment or preparation to fit the grain for a final arrival.

The court says in the case above cited [page 915]: "In the first place, a simple, direct, and forthright statement of the intent and the event as to the interstate character of the shipments would have been an easy matter for the appellant's able counsel. A brief allegation such as the following would have answered the purpose: 'Prior to the time that each shipment mentioned in this complaint left the interior point of origin, the defendant intended that such shipment would be transported into another state or to a foreign country; and such shipment was in fact so transported.'"

But plaintiff's counsel who are the same in the case at bar as in the former case have chosen to disregard this form of allegation and for purposes of their own to substitute the word "contemplate" for a definite statement of intention.

It seems that notwithstanding counsel have the definite answer of this court, the Circuit Court of Appeals of the Ninth Circuit, Oregon-Washington R. & Nav. Co. v. Strauss & Co., 73 F.2d 912, and a denial of certiorari by the Supreme Court of the United States, 294 U.S. 723, 55 S.Ct. 551, 79 L.Ed. 1255, upon the particular form of complaint, they nevertheless persist in bringing the matter before the courts for another determination. But the law laid down in the cause above referred to is conclusive upon this court.

If the allegation of the complaint is disregarded upon the stipulation of facts, the same vice appears.

The fundamental error of plaintiff is in assuming that all goods which are found eventually in interstate or foreign commerce are so designated from the beginning of the shipment.[3] But if this were true, intrastate commerce would be non-existent. A business may be of such a character that any interference with its operation by way of charging of rates for service[4] or by control of its labor[5] or by improper inspection rules established by the state of origin[6] interstate commerce in

---

interstate movement are reshipped by the consignee, after a brief interval, to another point, does not, of course, establish an essential continuity of movement to the latter point. The reshipment, although immediate, may be an independent intrastate movement. The instances are many where a local shipment follows quickly upon an interstate shipment and yet is not to be deemed part of it, even though some further shipment was contemplated when the original movement began."

"If the interstate movement has not begun, the mere fact that such a movement is contemplated does not withdraw the property from the state's power to tax it." Minnesota v. Blasius, 290 U.S. 1, 9, 54 S.Ct. 34, 37, 78 L.Ed. 131.

[3] "But because there is a flow of interstate commerce which is subject to the regulating power of the Congress, it does not necessarily follow that, in the absence of a conflict with the exercise of that power, a state may not lay a non-discriminatory tax upon property which, although connected with that flow as a general course of business, has come to rest and has acquired a situs within the state." Minnesota v. Blasius, 290 U.S. 1, 8, 54 S.Ct. 34, 36, 78 L.Ed. 131.

[4] Swift & Co. v. United States, 196 U. S. 375, 25 S.Ct. 276, 49 L.Ed. 518; Stafford v. Wallace, 258 U.S. 495, 42 S. Ct. 397, 66 L.Ed. 735, 23 A.L.R. 229. The criticism of Stafford v. Wallace is noteworthy:

"The use of this authority as a basis for the conclusion in Stafford v. Wallace clearly shows that the case can not be cited to show what is interstate and what is intrastate commerce in a controversy over rates to determine whether they come normally within the regulation of federal or state authority." Atlantic Coast Line Railroad Company v. Standard Oil Company of Kentucky, 275 U.S. 257, 273, 48 S.Ct. 107, 112, 72 L.Ed. 270.

[5] National Labor Relations Board v. Jones & Laughlin Steel Corporation, 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352; National Labor Relations Board v. Friedman-Harry Marks Clothing Co., 301 U.S. 58, 57 S.Ct. 645, 630, 81 L.Ed. 921, 108 A.L.R. 1352; Washington, etc., Coach Co. v. National Labor Relations Board, 301 U.S. 142, 57 S.Ct. 648, 81 L.Ed. 965.

[6] Lemke v. Farmers' Grain Co., 258 U. S. 50, 42 S.Ct. 244, 66 L.Ed. 458; Dahn

the particular commodity might be unduly burdened, affected or obstructed. Such a business may be regulated by the federal government as to such features. The docks and facilities might be similarly placed under control in the public interest. But it does not follow that every pound of the particular commodity shipped by a concern so engaged from one point to another in the same state immediately enters the stream of interstate commerce. The plaintiff railroad itself is an instrumentality in interstate commerce and as such subject to widespread regulation, but that does not mean that it can charge an interstate rate on every pound of freight carried from Pendleton, Oregon, to Portland, Oregon.

The Circuit Court of Appeals said in the former case: "In view of the foregoing, the conclusion is inescapable that the reason why the appellant did not directly allege the shipper's 'continuing intent' (United States v. Erie R. Co., supra, at pages 101 and 102 of 280 U.S., 50 S.Ct. 51, 52, 74 L.Ed. 187) or 'original and persisting intention' (the Settle Case, supra, at page 174 of 260 U.S., 43 S.Ct. 28, 31, 67 L.Ed. 189), was that the appellant could not truthfully do so." Page 915.

This extract states the law. The decisions of the Supreme Court of the United States have never departed from the test.

 The intention is, of course, a question of fact.[7] Plaintiff is required to plead and prove by a preponderance of the evidence "an original and continuing" intention to ship the particular car load lot in interstate or foreign commerce.[8] Under the agreed facts, this court would be bound to hold, on the contrary, that while defendant contemplated that the bulk of grain committed by itself or its consignors to plaintiff carrier would eventually find its way to a foreign or interstate destination, it only intended that each particular car load be shipped to Portland. Then, after inspection, weighing, grading and determination of protein and moisture content, defendant first made a preliminary allocation of the particular car load to interstate, foreign or intrastate trade or to storage, as exigencies of the business demanded. Weight, grade, protein and moisture percentages were major factors in the price and the assignment of the particular grain to intrastate or interstate or foreign commerce. The amount of grain of a particular classification on hand, the demand for the particular type of grain contained in the car load lot, the amount of conditioning or mixing required to fit the particular car load for inclusion under a contract already negotiated or subsequently received and the other complex considerations entered into final determination of destination.

Under state and federal law, the inspection which was conclusive on buyer and seller was made at Portland, Oregon.[9] The stage was here first set for a conclu-

ke-Walker Milling Co. v. Bondurant, 257 U.S. 282, 42 S.Ct. 106, 66 L.Ed. 239.

7 Where the owner at some point has complete control of the goods, the Supreme Court say:

"The character of the shipment in such a case depends upon all the evidential circumstances looking to what the owner has done in the preparation for the journey and in carrying it out." Hughes Bros. Timber Co. v. Minnesota, 272 U.S. 469, 475, 476, 47 S.Ct. 170, 172, 71 L.Ed. 359.

Representative cases where the intention to transport initially in intrastate commerce only was found are: Coe v. Errol, 116 U.S. 517, 6 S.Ct. 475, 29 L. Ed. 715; Bacon v. Illinois, 227 U.S. 504, 33 S.Ct. 299, 57 L.Ed. 615; General Oil Co. v. Crain, 209 U.S. 211, 28 S.Ct. 475, 52 L.Ed. 754; Pittsburgh & Southern Coal Co. v. Bates, 156 U.S. 577, 15 S.Ct. 415, 39 L.Ed. 538; American Steel & Wire Co. v. Speed, 192 U. S. 500, 24 S.Ct. 365, 48 L.Ed. 538; Dia-

mond Match Co. v. Ontonagon, 188 U. S. 82, 23 S.Ct. 266, 47 L.Ed. 349.

8 "To a foreign destination intended at the time of shipment". Texas & New Orleans Railroad Co. v. Sabine Tram Co., 227 U.S. 111, 124, 33 S.Ct. 229, 234, 57 L.Ed. 442; "intended by the shippers to be exported to foreign countries." Railroad Commission of Louisiana v. Texas & Pacific Railway Co., 229 U.S. 336, 341, 342, 33 S.Ct. 837, 840, 57 L.Ed. 1215; "The movement of grain was continuous and was so intended to be at the time shipment began". Kerr Gifford & Co. v. Clyde G. Huntly, unreported opinion of the District Court of the District of Oregon, Sept. 6, 1927; United States v. Erie Railroad Co., 280 U.S. 98, 50 S.Ct. 51, 74 L.Ed. 187; Baltimore & O. S. W. R. Co. v. Settle, 260 U.S. 166, 43 S.Ct. 28, 67 L.Ed. 189.

9 The facts are covered by the stipulation. See 7 U.S.C.A. § 71 to § 87, both inclusive, and Oregon Code (1930) Sec. 61-601 to Sec. 61-637, both inclusive.

sion as to ultimate destination. Logically, here was the principal place of business of defendant.[10] The particular car load lot was shipped here from points in Oregon under local bill of lading which, while not conclusive, raises a presumption of the intrastate character of the shipment. But it is clear defendant was not able to positively decide what particular car loads of grain would go to destinations in foreign countries or to points in other states or to Oregon points or be placed in storage for long periods of time. The defendant did not commit these goods to a carrier with intention that they all go to a foreign des-tination, and subsequently change its design as to a part.[11] It intended all should be shipped to Portland and that there, after inspection, it would decide, based upon conditions then existing, what the final disposition should be.[12] As to wheat consigned to defendant, it is obvious that under this situation neither the defendant nor its consignors could formulate the requisite intention.

Some elements of distinction between the stipulated facts and those which found other decisions may be emphasized. All this grain did not eventually go into either interstate or foreign commerce.[13] A sub-

---

[10] Contrast this situation with the Bondurant Case, supra, where shipment was from North Dakota but inspection and grading was under the federal law made at Minneapolis where the principal place of business of the consignee was maintained. Lemke v. Farmers' Grain Co., 258 U.S. 50, 53–55, 42 S.Ct. 244, 66 L.Ed. 458.

[11] Cases of subterfuge are numerous, but in each the original intention was clearly outlined by the surrounding circumstances. Thus the ultimate intention was found as a fact. Baer Bros. Mercantile Co. v. Denver & Rio Grande Railroad Co., 233 U.S. 479, 34 S.Ct. 641, 58 L.Ed. 1055; Texas & New Orleans Railroad Co. v. Sabine Tram Co., 227 U. S. 111, 33 S.Ct. 229, 57 L.Ed. 442.

Cases where a possible change of intention is discarded as a test are Dahnke-Walker Milling Co. v. Bondurant, 257 U. S. 282, 291–293, 42 S.Ct. 106, 66 L.Ed. 239; Lemke v. Farmers' Grain Co., supra. The suggestion of effect of possible change of intention indicates that there was found an "original and persisting intention" to transport in interstate commerce.

In Minnesota v. Blasius, 290 U.S. 1, 10, 54 S.Ct. 34, 37, 78 L.Ed. 131, it is said:

"The mere power of the owner to divert the shipment already started does not take it out of interstate commerce if it appears 'that the journey has already begun in good faith and temporary interruption of the passage is reasonable and in furtherance of the intended transportation.' Hughes Bros. Timber Co. v. Minnesota, 272 U.S. 469, 476, 47 S.Ct. 170, 71 L.Ed. 359." The allegation of the complaint negatives this original intention here.

[12] "The property was held by the plaintiff in error in Chicago for his own purposes and with full power of disposition. It was not being actually transported, and it was not held by carriers for trans-portation. The plaintiff in error had withdrawn it from the carriers. The purpose of the withdrawal did not alter the fact that it had ceased to be transported and had been placed in his hands. He had the privilege of continuing the transportation under the shipping contracts, but of this he might avail himself or not, as he chose. He might sell the grain in Illinois or forward it, as he saw fit. It was in his possession, with the control of absolute ownership. He intended to forward the grain after it had been inspected, graded, etc., but this intention, while the grain remained in his keeping, and before it had been actually committed to the carriers for transportation, did not make it immune from local taxation. He had established a local facility in Chicago for his own benefit, and while, through its employment, the grain was there at rest, there was no reason why it should not be included with his other property within the state in an assessment for taxation which was made in the usual way, without discrimination." Bacon v. Illinois, 227 U.S. 504, 516, 33 S. Ct. 299, 303, 57 L.Ed. 615. See, also, Southern Pacific Co. v. Van Hoosear, 9 Cir., 72 F.2d 903, 906–911; Federal Compress & Warehouse Co. v. McLean, 291 U.S. 17, 54 S.Ct. 267, 78 L.Ed. 622; Chassaniol v. Greenwood, 291 U. S. 584, 54 S.Ct. 541, 78 L.Ed. 1004.

[13] "No oil is sold at St. Rose except what is exported. The only business conducted there is the unloading of oil from railroad tank cars into the storage tanks and the loading of the oil from the storage tanks aboard the tankers for shipment to England, France, and other foreign ports." Carson Petroleum Co. v. Vial, 279 U.S. 95, 99, 49 S.Ct. 292, 73 L. Ed. 626.

"The purchases are made for export, there being no consumption of the products at Galveston." Southern Pacific Terminal Company v. Interstate Com-

stantial proportion (13.8%) reached final destinations in Oregon. It is clear that upon initial shipment defendant did not know whether the car load would form part of that percentage or not. The grain was not prepared in the interior for foreign shipment[14] but was prepared at Portland for shipment intrastate or interstate as conditions demanded. It did not all go through a standardized process at the dock to prepare it for foreign shipment.[15] Part was stored, part processed in one manner, part in another, part was shipped unmixed with grain of other grades, part was mingled with other grain of different quality to bring it up to the specifications of a contract and finally part was shipped to points abroad, part to other states and no inconsiderable part to points in the State of Oregon.

■ Since the original intention is the test, plaintiff can not by the device of segregating the shipments which actually did go to foreign points from those which eventually arrived at destinations in other states or in the state of Oregon metamorphize an initial movement in intrastate commerce into a continuous transportation in foreign trade. The fact that certain wheat was applied upon a certain foreign contract even if immediately after the arrival thereof in Portland does not establish an intention at the initiation of the shipment to make this application where other wheat forwarded under like conditions was eventually delivered at Oregon points. Especially is this true where plaintiff is not sure enough to even allege the intention in the manner outlined by the appellate court.

It was long ago pointed out there is grave difficulty in discovering the intention of the shipper as to goods which are delivered to his possession after the completion of a journey between points within a state and which he eventually ships to an interstate or foreign destination.[16] But the question is one of fact. Here all criteria establish the intention not to commit the goods even tentatively to any final destination until after inspection at Portland.

If a general contemplation of ultimate export were sufficient no firm in the export business could buy goods and have them shipped to the point where the foreign journey was eventually to commence without characterizing the initial transportation although wholly within the state as interstate commerce. This seems to be the final object of the carrier. But upon this point the Supreme Court have spoken decisively. "Mere intention by the owner ultimately to send the logs out of the state does not put them in interstate commerce, nor does preparatory gathering for that purpose at a depot. It must appear that the movement for another State has actually begun and is going on." Hughes Bros. Timber Co. v. Minnesota, 272 U.S. 469, 475, 47 S.Ct. 170, 172, 71 L.Ed. 359.

Thus, conclusive authority has prejudged the allegation of this complaint. The stipulated facts bear out the conclusion that the statements could have been made no broader.

The complaint is dismissed for failure to state a cause of action in accordance with the former ruling.

---

merce Commission and Young, 219 U.S. 498, 526, 31 S.Ct. 279, 287, 55 L.Ed. 310.

14 "It was to supply the demand of foreign countries that the lumber was purchased, manufactured, and shipped, and to give it a various character by the steps in its transportation would be extremely artificial." Texas & New Orleans Railroad Co. v. Sabine Tram Co., 227 U.S. 111, 127, 33 S.Ct. 229, 234, 57 L. Ed. 442.

15 See Southern Pacific Terminal Company v. Interstate Commerce Commission and Young, supra.

16 See Hughes Bros. Timber Co. v. Minnesota, 272 U.S. 469, 47 S.Ct. 170, 71 L.Ed. 359; Champlain Realty Co. v. Brattleboro, 260 U.S. 366, 43 S.Ct. 146, 67 L.Ed. 309, 25 A.L.R. 1195; Coe v. Errol, 116 U.S. 517, 6 S.Ct. 475, 29 L. Ed. 715.